1

2

3

4

5

6           UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON
7                 AT SEATTLE

8 MIKE KREIDLER,

9         Plaintiff,

10    v.                      Case No.  C06-0697RSL

11 DANNY L. PIXLER, *et al.*,      ORDER GRANTING IN PART
                             AND DENYING IN PART
12        Defendants.          MOTION TO DISMISS; GRANTING
                             LEAVE TO AMEND

13

14

15                 **I.  INTRODUCTION**

16      This matter comes before the Court on a motion to dismiss filed by several, but not

17 all, of the defendants (Dkt. #21).  Anthony Huff, Sheri Huff, Roxann Pixler, and Midwest

18 Merger Management, LLC (collectively, the "moving defendants") move to dismiss based

19 on lack of personal jurisdiction.[1]  Alternatively, they seek (1) dismissal of all claims

20 against them based on Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief

21 may be granted, and (2) dismissal of the fraud, civil conspiracy, Consumer Protection

22 _____

23     [1] Defendants do not contest the Court's exercise of personal jurisdiction over
defendants Danny Pixler, who is married to Roxann Pixler, and Certified Services, Inc.
24 ("Certified").  This matter has been automatically stayed as to Certified due to its filing in
the U.S. Bankruptcy Court for the Southern District of Florida.
25

1   Act, and Criminal Profiteering Act claims based on Fed. R. Civ. P. 9(b).  At the request

2   of the parties, the Court heard oral argument in this matter on November 20. 2006.

3         For the reasons set forth below, the Court grants the motion in part and denies it in

4   part, and grants plaintiff permission to file an amended complaint.

5                                    **II.  DISCUSSION**

6   **A.     Background Facts.**

7         Plaintiff Mike Kreidler is the Insurance Commissioner for the State of

8   Washington.  Plaintiff is the owner of all causes of action of Cascade National Insurance

9   Company ("Cascade"), which has been placed into receivership for liquidation pursuant

10  to the state insurance code.  Plaintiff brings this action in his official capacity as the

11  receiver of Cascade.

12        Cascade was a domestic stock insurer engaged in providing insurance for private

13  passenger automobile and commercial trucking and for workers' compensation.  Cascade

14  began experiencing financial difficulties, and its owner, Legend Holdings, Inc., sought a

15  purchaser or investor for the company.  In the fall of 2003, defendant Danny Pixler

16  ("Pixler") began discussions to purchase Cascade.

17        Pixler is a longtime friend, business partner, and brother-in-law of defendant

18  Anthony Huff.  Mr. Huff was married to Sheri Huff; they are now divorced.

19        As alleged in the complaint, Pixler "was engaged in a business enterprise" called,

20  among other names, The Cura Group ("Cura").  Complaint at ¶ 3.4.  Cura served as a

21  professional employer organization ("PEO").  A PEO, also referred to as a labor

22  contractor, provides human resources services to its clients, typically small and medium

23  sized businesses, including payroll and benefits administration, health and workers'

24  compensation insurance programs, and other similar services directly to the employer's

25

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 2

1  workforce.  The workforce employees become employed by the PEO, and are then leased

2  or contracted to the PEO's clients.  Pixler needed a workers' compensation insurer

3  licensed in California, as Cascade was, to provide insurance for his PEO operations.

4         The purchase of Cascade involved a complicated series of transactions involving

5  several entities.  In November 2003, Legend Holdings executed documents, including a

6  Term Sheet; Pixler also executed the Term Sheet using his power of attorney for Eugene

7  Weiss (the "Buyer").  The Term Sheet provided for a transfer of 9.9% of the ownership in

8  Cascade, immediate deposit by the Buyer of $1 million to be held on account in the name

9  of Midwest Merger Management ("Midwest"), regulatory approvals, an option for the

10  Buyer to acquire an additional 90.1% interest in Cascade, and payments by the Buyer on

11  an outstanding bank loan.  During the relevant time, Midwest was a Kentucky LLC which

12  was owned 50% by Sheri Huff, 49% by Roxann Pixler, and 1% by Michele Brown, Mr.

13  Huff's secretary.  The Term Sheet also provided that the parties would enter into an

14  agreement for Cascade to provide workers' compensation insurance on behalf of the

15  Buyer "and/or his assigns (The Cura Group, Inc.)."  Complaint at ¶ 3.8.

16         The parties executed a second agreement regarding the purchase of Cascade.  In

17  December 2003, Legend Holdings entered into a Stock Purchase Agreement (the

18  "Agreement") with Gudeman & Weiss ("G&W"), an entity formed at the direction of

19  Pixler to acquire insurers to provide workers' compensation insurance to the PEOs.

20  Pixler owned 90% of G&W during the relevant time; the remainder was owned by

21  Edward Gudeman and Eugene Weiss.  Pursuant to the Agreement, Gudeman & Weiss

22  purchased a 9.9% interest in Legend Holdings, with an option to purchase the remaining

23  90.1% interest.  G&W received the funds for the purchase from Midwest.  Among other

24  funding mechanisms, the Agreement provided that $1 million would be transferred to an

25

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 3

1  account held in a fiduciary capacity by the bank in the name of Midwest, with "signatory

2  authority residing only in [Pixler]." Complaint at ¶ 3.10. The Agreement provided that

3  after closing, the parties would enter into an agreement whereby Cascade would provide

4  workers' compensation insurance to the buyer's clients.

5  Pixler represented that Certified, the successor entity of Cura, would provide the

6  human resources services to the PEO's clients and provide the financial support to

7  Cascade. Midwest owned approximately 70% of Certified. Certified was to prepare the

8  workers' compensation policies to be executed and distributed by Cascade. Pixler

9  formed a local California PEO, American Staff Resources of California, Inc. ("ASRC"),

10  to provide the services offered and performed by Certified to their business clients in

11  California. ASRC would be the named insured on the workers' compensation policies.

12  In February 2004, Cascade issued a workers' compensation master policy in

13  California through ASRC. Cascade and Pixler entered into two workers' compensation

14  agreements. The first was signed in August 2004 and the second was signed in October

15  2004. Midwest made the reimbursements and payments, including the payments that

16  were due from ASRC, to Cascade pursuant to the workers' compensation contracts.

17  Washington law requires that the Washington Insurance Commissioner ("OIC")

18  approve the acquisition of 10% or more of direct or indirect ownership of an insurance

19  company. Because the transaction initially involved a 9.9% purchase, only an advisory

20  filing was required. After the OIC obtained more information, it informed the Huffs, the

21  Pixlers, and Midwest that the completion of a "Form A" was required. Declaration of

22  James Tompkins, (Dkt. #35) ("Tompkins Decl.") at ¶¶ 4, 5, 6, 8. The OIC did not

23  approve the transaction. Id. at ¶ 9.

24  Plaintiff alleges that ASRC, Pixler, and Certified failed to comply with the

25

26  ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO DISMISS - 4

1  payment terms in the workers' compensation contract.  Cascade demanded payment by
2  letter in September 2004.  Cascade sent three additional demand letters in November
3  2004 but did not receive payments.

4      Cascade was placed in receivership proceedings on November 30, 2004.  The
5  receiver made written demands for payment in December 2004 and August 2005 to
6  Pixler, ASRC and Certified.  The demand included a total amount in excess of $15
7  million, including the security obligation deficiency and fully earned deductible
8  premiums.  Plaintiff alleges that Cascade is liable for losses under the workers'
9  compensation policies, even though defendants failed to remit premiums.

10     Plaintiff filed his complaint in King County Superior Court on April 18, 2006;
11 defendants promptly removed the case to this Court based on diversity.  Plaintiff alleges
12 the following claims: (1) breach of contract/breach of covenant of good faith and fair
13 dealing against ASRC, Certified, and Pixler; (2) negligent misrepresentation against
14 Pixler, Huff, and Certified; (3) fraud against Pixler, Huff, and Certified; (4) constructive
15 trust against the Pixlers, the Huffs, Certified, and Midwest; (5) unjust enrichment against
16 the Pixlers, the Huffs, Midwest, and Certified; (6) breach of fiduciary duty against Pixler,
17 Huff, and Certified; (7) civil conspiracy against the Pixlers, the Huffs, Midwest, and
18 Certified; (8) violations of Washington's Consumer Protection Act ("CPA") against all
19 defendants; and (9) violations of Washington's Criminal Profiteering Act against all
20 defendants.

21 **B.    Personal Jurisdiction.**

22     **1.    Relevant Standards.**

23     The plaintiff bears the burden of establishing personal jurisdiction.  See, e.g.,
24 Ziegler v. Indian River County, 64 F.3d 470, 473 (9th Cir. 1995) (citing Farms Ins.

25

26 ORDER GRANTING IN PART AND
   DENYING IN PART MOTION TO DISMISS - 5

1  Exchange v. Portage La Prairie Mut. Ins. Co., 907 F.2d 911, 912 (9th Cir. 1990)).  A

2  plaintiff need only make a prima facie showing of jurisdictional facts through materials

3  submitted in opposition to a defendant's motion to dismiss.  See, e.g., Ballard v. Savage,

4  65 F.3d 1495, 1498 (9th Cir. 1995); Ziegler, 64 F.3d at 473.

5         The exercise of jurisdiction must comport with the state's long arm statute, and

6  with the constitutional requirement of due process.  See Omeluk v. Langsten Slip &

7  Batbyggeri, 52 F.3d 267, 269 (9th Cir. 1995) (internal citation omitted).  "Because the

8  Washington long arm statute reaches as far as the Due Process Clause, all we need to

9  analyze is whether the exercise of jurisdiction would comply with due process."  Id.

10 (internal citations omitted).  For a forum state to have personal jurisdiction over an out-

11 of-state defendant, that defendant must "have certain minimum contacts with the forum

12 state, such that the maintenance of the suit does not offend 'traditional notions of fair

13 play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316

14 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  The due process

15 requirements ensure that individuals have "fair warning that a particular activity may

16 subject [them] to jurisdiction of a foreign sovereign."  Shaffer v. Heitner, 433 U.S. 186,

17 218 (1977).

18        Where, as in this case, general jurisdiction is lacking, a court may nevertheless

19 exercise "limited" or "specific" personal jurisdiction depending upon "the nature and

20 quality of the defendant's contacts in relation to the cause of action."  Data Disc, Inc. v.

21 Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977).  The Ninth Circuit utilizes

22 a three-part test for determining whether due process allows for the exercise of specific

23 jurisdiction: "(1) the nonresident defendant must have purposefully availed himself of the

24 privilege of conducting activities in the forum by some affirmative act or conduct; (2)

25

26 ORDER GRANTING IN PART AND
   DENYING IN PART MOTION TO DISMISS - 6

1  plaintiff's claim must arise out of or result from the defendant's forum-related activities;

2  and (3) exercise of jurisdiction must be reasonable." Roth v. Garcia Marquez, 942 F.2d

3  617, 620-21 (9th Cir. 1991) (emphasis removed).

4      The purposeful availment inquiry requires an evaluation of whether the

5  "defendant's conduct and connection with the forum State are such that he should

6  reasonably anticipate being haled into court there." Core-Vent Corp. v. Nobel Indus. AB,

7  11 F.3d 1482, 1485 (9th Cir. 1993).  This element may be met if "the defendant has taken

8  deliberate action within the forum state or if he has created continuing obligations to

9  forum residents. . . .  It is not required that a defendant be physically present within, or

10  have physical contact with, the forum, provided that his efforts are purposefully directed

11  toward forum residents." Ballard, 65 F.3d at 1498 (internal citations omitted); see also

12  Davis v. Metro Prods., Inc., 885 F.2d 515, 520 (9th Cir. 1989) (explaining that the first

13  prong is met if defendants "purposefully directed their activities toward or consummated

14  some transaction with the forum or residents thereof").

15      The second element of the specific jurisdiction test requires the plaintiff's claim to

16  arise out of or result from the defendant's forum-related activities. Garcia Marquez, 942

17  F.2d at 620-21.  Once a plaintiff has satisfied the first two prongs on the test, the burden

18  shifts to the defendant to present a "compelling case" that the exercise of jurisdiction is

19  unreasonable. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir.

20  2002); see also Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1087 (9th

21  Cir. 2000) (explaining that defendant bears the burden of showing that the exercise of

22  personal jurisdiction would be unreasonable) (citing Burger King Corp. v. Rudzewicz,

23  471 U.S. 462, 476-77 (1985)).  Courts consider seven factors when determining whether

24  the exercise of jurisdiction comports with traditional notions of fair play and substantial

25

26  ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO DISMISS - 7

1   justice, and is therefore reasonable: "(1) the extent of a defendant's purposeful

2   interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of

3   conflict with the sovereignty of the defendant's state; (4) the forum state's interest in

4   adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6)

5   the importance of the forum to the plaintiff's interest in convenient and effective relief;

6   and (7) the existence of an alternative forum."   RIO Props., Inc. v. RIO Int'l Interlink,

7   284 F.3d 1007, 1021 (9th Cir. 2002).

8          As an initial matter, plaintiff premises some of his arguments on the actions of all

9   defendants, arguing that since they acted in concert, they are all responsible for the

10  actions with this forum.  However, "[e]ach defendant's contacts with the forum State

11  must be assessed individually."   Calder v. Jones, 465 U.S. 783, 790 (1984).

12         **2.      Midwest Management, LLC.**

13         Defendants argue that Midwest "is not licensed to do business, and does no

14  business, in Washington; it does not own any property in Washington; it does not have a

15  registered agent for service of process in Washington; and it does not advertise, solicit

16  business, or direct any of its business activities to Washington residents."  Defendants'

17  Motion at p. 13.  Despite those sweeping assertions, Midwest purposefully directed its

18  activities toward Washington and conducted business with Cascade, a Washington

19  resident.  Midwest was responsible for and did remit some premium payments to Cascade

20  in Washington pursuant to the workers' compensation coverage contract.  Even though

21  Midwest did not sign the relevant agreements, it had an ongoing obligation to Cascade to

22  remit the payments.  Midwest also deposited earnest money with a Washington bank to

23  induce Cascade's owners into executing the Agreement.  In addition, plaintiff alleged that

24  Midwest collected premium payments from clients and retained them, defrauding

25

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 8

1  Cascade out of payments to which it was contractually entitled.  Midwest could

2  reasonably anticipate being haled into court in Washington for failing to meet its funding

3  obligations to Cascade.  These contacts are sufficient to satisfy the purposeful availment

4  prong of the test.  Plaintiff's claims arise out of Midwest's funding obligations and its

5  cessation of payments.

6         The Court also considers the reasonableness of exercising personal jurisdiction

7  over Midwest.  As for the extent of Midwest's interjection into the forum, in addition to

8  the factors above, there is also some evidence that Midwest, Mr. Huff, and Mr. Pixler

9  used various transactions to acquire ownership of Cascade, which they knew was a

10  Washington company.  Midwest was created by Mr. Huff, Mr. Pixler, and their attorney

11  to purchase other companies.  R. Pixler Dep. at p. 38.  Mr. Pixler, with his power of

12  attorney for Eugene Weiss, purchased 9.9% of Cascade.  G&W, mostly owned by Mr.

13  Pixler, used money from Midwest to purchase 9.9% and an option to purchase the

14  remainder of Legend Holdings, who owned the other 90.1% of Cascade.  Indeed, the OIC

15  became concerned by August 2004 that Midwest, Certified, Mr. Pixler, and Mr. Huff

16  were in a position of control over Cascade.[2]  Tompkins Decl. at ¶ 4.  The OIC noted that

17  pursuant to the Agreement, Midwest was required to give consent before G&W could use

18  Midwest's loan proceeds to complete the stock purchase of Cascade or meet its other

19  financial obligations to Cascade.  Id. at ¶ 5.  As a result of its investigation, the OIC

20  "determined that the relationship between G&W, the ostensible acquiring party, and

21

---

22      [2] In May 2004, Mr. Huff pled guilty to three counts of mail fraud in the United

23  States District Court for the Western District of Kentucky.  Plaintiff's Response,
Appendix A.  It is a federal crime for anyone convicted of a felony involving dishonesty

24  or a breach of trust to engage in or participate in the business of insurance.  18 U.S.C.
§ 1033(e).

25

26  ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO DISMISS - 9

1   [Midwest] as the 'lender' with full control, put [Midwest] in a control or management

2   role by requiring prior approval before G&W could utilize the funds." Id. at ¶ 6.  By

3   attempting to gain an ownership interest in Cascade and exercising some control over it,[3]

4   Midwest further interjected itself into the forum and subjected itself to Washington's

5   insurance regulations.  Furthermore, Midwest has not shown that it would be burdensome

6   to defend itself in this forum or that exercising jurisdiction over it would conflict with the

7   sovereignty of its home state of Kentucky.  Kentucky provides an alternate forum, but it

8   is not a superior forum.  Although Midwest and the Huffs are in Kentucky, plaintiff and

9   Cascade are in Washington, ASRC is a California company incorporated in Delaware,

10  and the Pixlers reside in Florida.

11        Defendants also argued, for the first time during the oral argument regarding this

12  motion, that Certified's bankruptcy proceedings in the Southern District of Florida

13  provide a superior forum.  The Court ordered defendants to file a supplemental

14  memorandum addressing that issue, and they have done so.  The bankruptcy proceedings

15  involve Cura, now known as Certified HR Services, Co., and defendant Certified.  The

16  trustee filed an adversary proceeding against Midwest asserting, among other things, that

17  it improperly diverted funds from Certified HR Services, Co.  The trustee also filed a

18  second adversary proceeding against Certified, ASRC, and other entities to consolidate

19  Certified with the bankruptcy proceeding involving Certified HR Services, Co.  On

20  February 24, 2006, a settlement agreement was entered into between the trustee and

21  Midwest, Huff, Pixler, Certified, and others.  As part of the settlement, Certified was

22  substantively consolidated with its subsidiary Certified HR Services in the bankruptcy

23  

24        [3] Plaintiff may not be able to prove these facts at trial.  However, the evidence

25  offered in opposition to the motion is sufficient to defeat the motion to dismiss.

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 10

1  proceedings.  The agreement and subsequent order contained, among other things, (1) a

2  release of the trustee's claims against defendants, (2) an acknowledgment that Certified

3  paid funds to Midwest, and (3) a statement that the agreement has no res judicata or

4  collateral estoppel effect on this litigation.  Defendants argue that the bankruptcy court is

5  a better forum, in part because it is fully aware of the issues involved.  While that may be

6  true, this Court has now spent a significant amount of time considering the issues.

7  Moreover, the adversary proceeding appears to have resolved only the *trustee's* claims

8  against some of the defendants in this case.  It is unclear how defendants believe Cascade

9  and plaintiff, who were not parties to the adversary proceeding, could have litigated their

10  claims against all the defendants named in this case.  Also, this case involves additional

11  claims, issues, and parties not involved in the bankruptcy proceeding.  Although this

12  action is now stayed as to Certified, plaintiff may pursue the claims against the other

13  defendants.

14       Defendants also argue that the bankruptcy court now controls some of the funds

15  that Certified paid to Midwest for Cascade's benefit, which could affect plaintiff's

16  constructive trust claim in this case.  Notably, however, by its own terms, the adversary

17  proceeding order does not have res judicata or collateral estoppel effect in this

18  proceeding.  Even if some of the funds are under the control of the bankruptcy court,

19  plaintiff is free to pursue all available remedies against the defendants.

20       Furthermore, Washington has a strong interest in providing a forum for this

21  litigation based on the involvement of its Insurance Commissioner and the alleged fraud

22  perpetrated on a domestic company.  Morever, efficiency and economy would be

23  furthered by exercising jurisdiction over the defendants rather than requiring the OIC to

24  litigate its claims against them in multiple forums.

25

26  ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO DISMISS - 11

1    Accordingly, the Court finds that the exercise of personal jurisdiction over

2  Midwest is reasonable and comports with due process.

3        **3.    Anthony Huff.**

4        Mr. Huff argues that many of his alleged contacts with Washington were the result

5  of Washington residents contacting him.  As defendants note, courts do not consider the

6  "unilateral" contacts of third parties in evaluating personal jurisdiction.  See, e.g., Silver

7  Valley Partners, LLC v. De Motte, 400 F. Supp. 2d 1262, 1265-66 (W.D. Wash. 2005).

8  Instead, the Court considers Mr. Huff's own contacts with the forum state, including the

9  conversations that he initiated with a Cascade employee regarding Cascade's financial

10  condition.  Declaration of Lai Morrell, (Dkt. #37) ("Morrell Decl.") at ¶ 9 (explaining

11  that Mr. Huff called her to obtain a better understanding of how Cascade's reserves were

12  calculated after Cascade received information showing that its reserves were deficient;

13  stating that she had two subsequent telephone calls with him about the issue).  In

14  addition, Mr. Huff at times directed Mr. Pixler's negotiations with Cascade.  Declaration

15  of John Ference, (Dkt. #38) ("Ference Decl.") at ¶ 4 (explaining, as Vice President of

16  Cascade, that he observed Mr. Pixler answering calls from Mr. Huff during negotiations

17  with Cascade; Mr. Huff appeared to be "providing direction and instruction to Mr. Pixler

18  with regard to the negotiations on the workers comp insurance coverage contract");

19  Declaration of Harold Anderson, (Dkt. #36) ("Anderson Decl.") at ¶ 8.

20        The Court also considers, as set forth above, the evidence that Mr. Huff was

21  attempting to gain control over Cascade.  Tompkins Decl. at ¶ 9 (explaining that the OIC

22  required Mr. Huff, among others, to complete Form A materials based on the OIC's

23  concern that they were seeking to gain control over Cascade).  Mr. Huff represented that

24  he had control over Midwest, which was a partial owner of Cascade.  LaForgia Dep. at

25

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 12

1   pp. 26-27 (CPA auditing Midwest and Certified testified that, based on his observations,

2   Mr. Huff was "significantly involved in [Midwest's] day-to-day activities"); id. at p. 24

3   (explaining that Mr. Huff represented to him that he was an owner of Midwest through

4   his wife); Huff Dep. at p. 87 (referring to Midwest as "my company); R. Pixler Dep. at

5   p. 39 (explaining that she executed a document naming Danny Pixler and Anthony Huff

6   the managers of Midwest).  Mr. Huff also created obligations to Washington residents by

7   representing to Mr. Anderson of Legend Holdings that Midwest would provide funding to

8   Cascade.  Anderson Decl. at ¶ 15 (Mr. Huff informed Mr. Anderson that "he would

9   withhold additional funding by [Midwest] of Cascade's loss reserves pending the

10  outcome of a revised actuarial study"); id. at ¶ 11 (explaining that Mr. Huff "summoned"

11  him to Kentucky in July 2004 to discuss "the financial backing for the payments due

12  Cascade from ASRC and Mainstay under the policies issued by Cascade and the ongoing

13  obligations of the purchaser under the [Agreement]"); id. at ¶ 16 (Mr. Huff gave Mr.

14  Anderson assurances that Midwest and Certified would fund bank payments and reserve

15  requirements for Cascade).  For purposes of this motion, these contacts are sufficient to

16  show that Mr. Huff, both directly and through Midwest, transacted business with

17  Washington residents and created continuing obligations to them.

18      Plaintiff's claims also arise out of Mr. Huff's forum-related activities.  They arise

19  out of Mr. Pixler's and Mr. Huff's alleged misrepresentations regarding the agreements

20  and funding commitments to Cascade.  Plaintiff also alleges that the defendants have

21  retained payments which should have been remitted to Cascade pursuant to the

22  agreements.

23      The Court also considers the reasonableness of exercising personal jurisdiction

24  over Mr. Huff.  Many of the same factors that weigh in favor of a finding of

25

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 13

1  reasonableness regarding Midwest compel the same finding regarding the other moving

2  defendants.  Furthermore, according to plaintiff's allegations, Mr. Huff had fairly

3  extensive contacts with Washington residents.  Mr. Huff has not shown that it would be

4  burdensome to defend himself in this forum, that exercising jurisdiction over him would

5  conflict with the sovereignty of his home state of Kentucky, or that Kentucky would

6  provide a superior forum.  As set forth above, Washington has a strong interest in

7  providing a forum for this litigation.  Efficiency and economy would be furthered by

8  exercising jurisdiction over Mr. Huff rather than requiring the OIC to litigate its claims

9  against defendants in multiple forums.

10      Accordingly, the Court finds that the exercise of personal jurisdiction over Mr.

11  Huff is reasonable and comports with due process.

12      **4.      Sheri Huff and Roxann Pixler.**

13      Plaintiff alleges that Ms. Huff and Ms. Pixler, who had ownership interests in

14  Midwest, "permitted, authorized, and/or acquiesced" in Midwest's transactions.

15  However, their deposition testimony highlights that they were not directly involved in the

16  Cascade transactions or in Midwest's operations.  S. Huff Dep. at p. 103 (explaining that

17  she had no involvement in Midwest's business affairs).  Plaintiff also argues that Ms.

18  Pixler and Ms. Huff facilitated the wrongful actions of the other defendants by allowing

19  themselves to be named as the owners of Midwest.  Although the Ninth Circuit has not

20  ruled on the "conspiracy theory" of personal jurisdiction, the Court agrees with the logic

21  in Silver Valley Partners, LLC, which rejected the theory.  400 F. Supp.2d at 1268.

22      Plaintiff also alleges that individuals cannot be shielded by the corporate form for

23  purposes of establishing personal jurisdiction.  Plaintiff's Opposition at p. 14 n.18 (citing

24  Davis v. Metro Prods., Inc., 885 F.2d 515, 520-21 (9th Cir. 1989) (discussing generally

25

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 14

1   the fiduciary shield doctrine).  Even if the corporate form is disregarded, the Court must

2   analyze Ms. Huff's and Ms. Pixler's contacts with this forum.  Davis, 885 F.2d at 521.

3   Ms. Huff and Ms. Pixler had no direct contact with this forum.  However, plaintiff has

4   also alleged that the other defendants were acting as agents for Ms. Huff and Ms. Pixler.

5   RCW 4.28.185(1)(a) (extending jurisdiction to defendants who transact business in state

6   "in person or through an agent").  For purposes of personal jurisdiction, the actions of an

7   agent are attributable to the principal.  See, e.g., Sher v. Johnson, 911 F.2d 1357, 1362

8   (9th Cir. 1990).  Plaintiff has not offered any evidence to show that any of the other

9   defendants acted as an agent of Ms. Pixler.  Instead, the evidence shows that Ms. Pixler

10  executed a document appointing Mr. Pixler as a manager of Midwest.  R. Pixler Dep. at

11  pp. 44, 77.  Therefore, while he may have been acting as an agent of Midwest, there is no

12  evidence that he was acting as Ms. Pixler's agent.  Accordingly, the Court lacks personal

13  jurisdiction over Ms. Pixler.

14      In contrast, Ms. Huff gave Mr. Huff her power of attorney and authorization to

15  sign documents on her behalf.  S. Huff Dep. at p. 130.  Plaintiff also alleges that Mr. Huff

16  was acting on Ms. Huff's behalf during his contacts with this forum, and she accepted the

17  profits from those contacts.  Although the issue is a close call, the evidence and

18  allegations are sufficient to show, for purposes of this motion, that Ms. Huff conducted

19  business in Washington through Mr. Huff.  Furthermore, plaintiff's claims arise out of

20  those contacts with the forum.  As set forth above, exercising jurisdiction over Mr. Huff

21  is reasonable, and the same factors show that exercising jurisdiction over Ms. Huff is

22  reasonable.  Even though Ms. Huff did not have direct contacts with the forum, she

23  cannot instruct another to act on her behalf, accept the financial benefits of his actions,

24  then disclaim any knowledge of the relevant actions.  Accordingly, defendants' motion to

25

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 15

1 dismiss Ms. Huff for lack of personal jurisdiction is denied.

2 **C.    Motion to Dismiss for Failure to State a Claim.**

3      A court should not grant a 12(b)(6) motion for failure to state a claim upon which

4 relief can be granted unless "it appears beyond a doubt that the Plaintiff can prove no set

5 of facts which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)

6 (explaining that the complaint must give the defendant "fair notice of what the plaintiff's

7 claim is and the grounds upon which it rests").  The complaint should be liberally

8 construed in favor of the plaintiff and its factual allegations taken as true.  <u>See, e.g.</u>,

9 <u>Oscar v. Univ. Students Coop. Ass`n</u>, 965 F.2d 783, 785 (9th Cir. 1992).  The Court is

10 "required to read the complaint charitably, to take all well-pleaded facts as true, and to

11 assume that all general allegations embrace whatever specific facts might be necessary to

12 support them."  <u>Peloza v. Capistrano Unified Sch. Dist.</u>, 37 F.3d 517, 521 (9th Cir. 1994)

13 (internal citations omitted).  Plaintiff is therefore entitled to the benefit of all reasonable

14 inferences that can be drawn from his allegations.

15      **1.    Negligent Misrepresentation Claim Against Anthony Huff.**

16      Washington has adopted the Restatement (Second) of Torts, which sets forth the

17 elements of a negligent misrepresentation claim:

18      (1) One who, in the course of his business, profession or employment . . . supplies
        false information for the guidance of others in their business transactions, is

19      subject to liability for pecuniary loss caused to them by their justifiable reliance
        upon the information, if he fails to exercise reasonable care or competence in

20      obtaining or communicating the information.

21 <u>See</u> <u>Havens v. C&D Plastics, Inc.</u>, 124 Wn.2d 158, 180 (1994).  Defendants argue that

22 plaintiff has failed to set forth any facts supporting the negligent representation claim.

23 The Complaint, however, alleges that Mr. Huff "was directly engaged in negotiations and

24 communications with [Cascade] relating to many aspects of the workers compensation

25

26 ORDER GRANTING IN PART AND
   DENYING IN PART MOTION TO DISMISS - 16

1  coverage contract, administration and reinsurance." Complaint at ¶ 1.5.  Although

2  defendants argue that the allegations are untrue, the Court must assume their truth for

3  purposes of this motion.  The Complaint further alleges that Mr. Huff's negligent

4  misrepresentations included "(a) misrepresentations as to the financial responsibility of

5  [Certified], (b) the status of claims or causes of action against [Certified] and/or Danny

6  Pixler, (c) the nature and identity of the entity(ies) liable under the Workers Comp

7  Contract with [Cascade], and (d) the status, relationship, and pecuniary interests of the

8  various corporations, persons and entities involved . . . ." Id. at ¶ 5.3.  Plaintiff also

9  alleges that the misrepresentations were material, Cascade justifiably relied on them, and

10  it was harmed.  Those allegations are sufficient to state a claim for negligent

11  misrepresentation.

12       **2.    Fraud Claim Against Anthony Huff.**

13       Defendants argue that plaintiff's fraud claim against Mr. Huff should be dismissed

14  because the allegations do not meet the requirements of Rule 9(b), which requires that in

15  "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall

16  be stated with particularity."  A plaintiff pleading fraud "must set forth more than the

17  neutral facts necessary to identify the transaction.  The plaintiff must set forth what is

18  false or misleading about a statement, and why it is false." Yourish v. California

19  Amplifier, 191 F.3d 983, 993 (9th Cir. 1999).  The complaint must allege the "time, place

20  and specific content of the false representations as well as the identities of the parties to

21  the misrepresentation." Miscellaneous Serv. Workers, etc. v. Philco-Ford Corp. WDL

22  Div., 661 F.2d 776, 782 (9th Cir. 1981).[4]  Although the complaint generally sets forth

23  _____

24       [4] The Court applies the pleading standard in the Federal Rules of Civil Procedure

25  and Ninth Circuit law, rather than Washington law, to analyze the sufficiency of

1   several misrepresentations made by Mr. Huff, it does not specifically identify any

2   statements, the recipient of the statements, the time, place, and specific content of the

3   representations, or explain why the statements were false.  Accordingly, the complaint

4   fails to plead the fraud claim with the requisite particularity, and the Court dismisses the

5   fraud claim without prejudice.

6        During oral argument, plaintiff requested that if the Court dismissed any of the

7   claims for failure to meet the pleading requirements, that it grant leave to amend.  The

8   Court grants plaintiff's request and grants it leave to file an amended complaint.

9        **3.     Breach of Fiduciary Duty Claim Against Anthony Huff.**

10       In his memoranda, Mr. Huff does not dispute that he had a fiduciary duty to

11  Cascade.  Instead, he alleges that the complaint fails to allege how he breached that duty.

12  The complaint's section on this claim states generally that Mr. Huff breached his

13  fiduciary duty and harmed Cascade.  In addition, other portions of the complaint allege

14  that Mr. Huff misrepresented facts to Cascade and retained for himself payments due to

15  Cascade.  Those allegations are sufficient to state a cause of action for breach of fiduciary

16  duty.

17       **4.     Constructive Trust and Unjust Enrichment Claims Against the Moving
             Defendants.**
18
         "Unjust enrichment occurs when one retains money or benefits which in justice
19
    and equity belong to another."  Bailie Comm., Ltd. v. Trend Bus. Sys., Inc., 61 Wn. App.
20
    151, 159 (1991).  Defendants argue that the complaint is devoid of facts to support
21
    plaintiff's claims for unjust enrichment and the equitable remedy of a constructive trust.
22
    However, the complaint alleges that the defendants "took possession of monies which had
23

24

25  plaintiff's fraud allegations.

26

1   been paid by clients of ASRC and/or [Certified] as and for premiums for workers

2   compensation insurance coverage provided by [Cascade].  Said defendant(s) received,

3   and have held and hold such monies in trust or constructive trust for and on behalf of

4   [Cascade]."  Complaint at ¶ 7.2.  Because plaintiff alleges that Mr. Huff was acting as

5   Ms. Huff's agent, the allegations against him are also allegations against her.  Although

6   the facts alleged against Midwest and Mr. Huff are relatively scant, they are sufficient to

7   satisfy the notice pleading requirement.

8          **5.     Civil Conspiracy Claim Against the Moving Defendants.**

9          A civil conspiracy "exists if two or more persons combine to accomplish an

10  unlawful purpose or combine to accomplish some purpose not in itself unlawful by

11  unlawful means."  <u>Corbit v. J.I. Case Co.</u>, 70 Wn.2d 522, 528 (1967).  Defendants argue

12  that the civil conspiracy claim sounds in fraud and must be pled with particularity under

13  Rule 9(b).  The Ninth Circuit has held that claims that are "grounded in fraud" or that

14  "sound in fraud" must satisfy the particularity requirement of Rule 9(b).  <u>Vess v. Ciba-

15  Geigy Corp.</u>, 317 F.3d 1097, 1103-04 (9th Cir. 2003).  In Washington, a civil conspiracy

16  must be established by clear, cogent, and convincing evidence, like a fraud claim.  <u>Corbit</u>,

17  70 Wn.2d at 528.  Moreover, the Ninth Circuit has held that "if the object of the

18  conspiracy is fraudulent," a plaintiff must comply with Rule 9(b) and "must plead, at a

19  minimum, the basic elements of a civil conspiracy."  <u>Wasco Prods., Inc. v. Southwall

20  Techs., Inc.</u>, 435 F.3d 989, 990-91 (9th Cir. 2006) (applying Rule 9(b) because the object

21  of the conspiracy was the manufacturer's misrepresentation of its product to the plaintiff

22  purchasers).  In this case, the gravamen of the conspiracy allegation is that the defendants

23  engaged in a scheme to take ownership of Cascade, induce it into providing insurance

24  coverage, use Cascade and its coverage to obtain premium payments from third parties,

25

26  ORDER GRANTING IN PART AND
    DENYING IN PART MOTION TO DISMISS - 19

1  and defraud it out of the premium payments that it was owed.  The conspiracy involved a

2  series of misrepresentations about the entities and individuals involved, their

3  relationships, and their financial commitments.  The conspiracy allegation therefore

4  sounds in fraud.

5        As with the fraud claim, however, the allegation is not pled with the requisite

6  particularity.  Instead, the complaint contains only general allegations that mirror the

7  elements of the claim.  Complaint at ¶ 10.2 ("Two or more of the defendants . . . have

8  combined to engage in conduct for and/or in furtherance of an unlawful purpose and/or

9  through unlawful means, and have entered into an express or implied agreement to

10 accomplish the common design or conspiracy").  Plaintiff has not identified with

11 particularity the who, what, where, when, why, and how of the supposed agreement to

12 defraud Cascade.  Accordingly, the civil conspiracy claim cannot stand as currently

13 alleged, and it is dismissed without prejudice.

14       **6.**    **Criminal Profiteering Act Claim Against the Moving Defendants.**

15       Plaintiff alleges that defendants violated RCW 9A.82.060, which provides as

16 follows:

17      (1) A person commits the offense of leading organized crime by:
             (a) Intentionally organizing, managing, directing, supervising, or financing
18     any three or more persons with the intent to engage in a pattern of criminal
       profiteering activity; or
19           (b) Intentionally inciting or inducing others to engage in violence or
       intimidation with the intent to further or promote the accomplishment of a pattern
20     of criminal profiteering activity.[5]

21 RCW 9A.82.010(4) defines "criminal profiteering" as

22     any act, including any anticipatory or completed offense, committed for financial
       gain, that is chargeable or indictable under the laws of the state in which the act
23

24     [5] The Court assumes, as the parties did, that a Criminal Profiteering Act claim can
   be alleged against a corporate entity like Midwest.
25

26

occurred and, if the act occurred in a state other than this state, would be chargeable or indictable under the laws of this state had the act occurred in this state and punishable as a felony and by imprisonment for more than one year, regardless of whether the act is charged or indicted.

"Pattern of criminal profiteering activity" is defined as "engaging in at least three acts of criminal profiteering, one of which occurred after July 1, 1985, and the last of which occurred within five years, excluding any period of imprisonment, after the commission of the earliest act of criminal profiteering."  RCW 9A.82.010(12).  Plaintiff notes that the statute specifically includes theft as an example.  RCW 9A.82.010(4)(e).

Defendants allege that the criminal profiteering claim sounds in fraud.  As with the civil conspiracy claim, it appears that the crux of the claim is that the defendants engaged in a scheme to defraud Cascade out of the premium payments that it was owed.  Plaintiff alleges that the conduct subject to the Criminal Profiteering Act also included deceiving regulators, obtaining from third parties large sums that were intended to pay Cascade's premiums, wrongfully retaining the premium payments, "deliberately concealing Mr. Huff's interest and participation" with Cascade because he was ineligible for involvement in the insurance industry, and "setting up sham entities without adequate capitalization to mislead Cascade and avoid detection of true ownership interests."  Plaintiff's Opposition at pp. 33-34.  Those allegations necessarily describe fraudulent conduct and are subject to the heightened pleading standard of Rule 9(b).  The Complaint, however, contains no specific allegations to meet that standard.  Accordingly, the Criminal Profiteering Act claim must be dismissed without prejudice.

## 7.    Consumer Protection Act Claim Against the Moving Defendants.

As an initial matter, defendants allege that the CPA claim sounds in fraud and is therefore subject to the pleading requirements of Rule 9(b).  Defendants, however, cite no authority holding that a CPA claim sounds in or is grounded in fraud.  Furthermore, a

1  comparison of the elements required for a CPA claim and for a fraud claim show that the

2  CPA claim does not sound in fraud.  A CPA claim, unlike a fraud claim, requires a public

3  interest impact, and does not require proof of intent and knowledge that material

4  misrepresentations are false or misleading.  Rather, it requires proof of an unfair or

5  deceptive act or practice.[6]  Accordingly, the CPA claim does not sound in fraud.  Cf.

6  Gordon v. Impulse Marketing Group, Inc., 375 F. Supp.2d 1040, 1048 (E.D. Wash. 2005)

7  (explaining that a claim under Washington's Commercial Electronic Mail Act and related

8  CPA claim did not sound in fraud because the claims required different elements); see

9  also Trask v. Butler, 123 Wn.2d 835, 845 (1994) (analyzing sufficiency of the CPA

10  allegations under Rule 8).

11        A review of the complaint shows that plaintiff has met the traditional pleading

12  requirements for the CPA claim.  Plaintiff alleges that Mr. Huff and Midwest deceived

13  Cascade's owner into agreeing to sell a portion of Cascade, made misrepresentations,

14  retained for themselves payments due to Cascade, and thereby injured Cascade.  Plaintiff

15  also alleges that Cascade was harmed as a result.  Given the potential public interest

16  impact of their conduct, the Court cannot find that plaintiff can prove no set of facts that

17  would entitle it to relief on the CPA claim.

## III.  CONCLUSION

19        For all of the foregoing reasons, the Court GRANTS IN PART AND DENIES IN

20  PART the moving defendants' motion to dismiss.  (Dkt. #21).  Plaintiff's claims against

21

22        [6] The elements of a CPA claim are: (1) an unfair or deceptive act or practice, (2)

23  occurring in trade or commerce, (3) with a public interest impact, (4) an injury to plaintiff
   in his or her business or property, and (5) a causal relationship between the unfair or

24  deceptive act and the resulting injury.  See, e.g., Hangman v. Ridge Training Stables, Inc.
   v. Safeco Title Ins. Co., 105 Wn. 2d 778, 780, 784 (1986).

25

26

1   Roxann Pixler are dismissed for lack of personal jurisdiction.  The Court dismisses

2   without prejudice plaintiff's fraud claim against Mr. Huff, the civil conspiracy claim

3   against the moving defendants, and the Criminal Profiteering Act claim against the

4   moving defendants.  Plaintiff may file an amended complaint no later than twenty days

5   from the date of this order.

6

7            DATED this 7th day of December, 2006.

8

9

10                                        *MMS S Casnik*
                                          Robert S. Lasnik
11                                        United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ORDER GRANTING IN PART AND
     DENYING IN PART MOTION TO DISMISS - 23