THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MIKE KREIDLER, Insurance Commissioner for the State of Washington and as Receiver for Cascade National Insurance Company, in Liquidation,<br><br>               Plaintiff,<br><br>    v.<br><br>DANNY L. PIXLER and ROXANN PIXLER, individually and their marital community; ANTHONY HUFF and SHERI HUFF, individually and their marital community; AMERICAN STAFF RESOURCES OF CALIFORNIA, INC., a Delaware corporation; CERTIFIED SERVICES, INC., a Nevada corporation; MIDWEST MERGER MANAGEMENT, LLC, a Kentucky Limited Liability Company; and JOHN DOES 1 – 10,<br><br>               Defendants. | NO. C06-0697RSL<br><br>PLAINTIFF'S MEMORANDUM IN SUPPORT OF JUDGMENT ON CLAIMS OF UNJUST ENRICHMENT, CONSTRUCTIVE TRUST, PIERCING THE CORPORATE VEIL, PROMISSORY ESTOPPEL, AND ENHANCED DAMAGES UNDER THE CONSUMER PROTECTION ACT AND CRIMINAL PROFITEERING ACT<br><br>NOTED FOR CONSIDERATION: 07/02/10 |

## TABLE OF CONTENTS

A.    Amounts Paid and Unpaid, and Amount
      Due for the Workers' Compensation Policy Program ...............................1

B.    Unjust Enrichment against Defendants Midwest Merger
      Management LLC, Danny Pixler, Anthony Huff, and Sheri Huff ...............2

C.    Constructive Trust against Defendants Midwest Merger
      Management LLC, Danny Pixler, Anthony Huff, and Sheri Huff ...............4

D.    Promissory Estoppel against Defendants Midwest Merger
      Management LLC and Danny Pixler ...............................................8

E.    Piercing the Corporate Veil/Disregard of Corporate Entity
      Against Defendants Anthony Huff, Sheri Huff, and Danny Pixler .............11

F.    Exemplary Damages against Defendants Midwest Merger
      Management LLC, Anthony Huff, Sheri Huff, and Danny Pixler
      under the Consumer Protection Act ...............................................23

G.    Exemplary Damages against Defendants Anthony Huff,
      Sheri Huff, and Midwest Merger Management LLC under the
      Criminal Profiteering Act ...........................................................23

H.    Conclusion ............................................................................ 24

## APPENDIX

A.    Chart comparing Trial Exhibits.

B.    Proposed Form of Judgment and
      Proposed Judgment on Jury Verdict and Claims Reserved by the Court.

Plaintiff submits this Memorandum pursuant to the Court's Order (Dkt. 352) in support of judgment for plaintiff on the equitable claims and an award of exemplary damages on the statutory claims.

### A.    Amounts Paid and Unpaid, and Amount Due for the Workers' Compensation Policy Program

Cascade National Insurance Company ("Cascade") provided a one-year workers' compensation policy to approximately 15,000 workers in California. The total amount still due and unpaid is $19,310,744.00, evidenced by the testimony, documentary exhibits, and supported by an actuarial expert.

Lai Morrell, accountant for Cascade and for the plaintiff Receiver[1], set up the accounts and books of Cascade for the workers' compensation program.[2]  The amounts due for that policy are set forth in the letter agreements[3] which include the self-reported premium, the audit premium, the fees, assessments and expenses, the deductible losses or claims incurred, and the IBNR.[4]  The itemized amounts unpaid are set forth in a summary chart[5] created by Ms. Morrell which is based on voluminous accounting data, loss runs, data from the California Insurance Guaranty Association, actuarial studies from Perr & Knight and Barbara Thurston, and the records of Cascade.[6]  The validity of the methodology and assumptions made in the actuarial studies were actuarially sound and could reasonably be relied upon by Cascade and by plaintiff in determining

---

[1] **Trial testimony of Lai Morrell**, 5/4/10, p. 98, lines 11 – 25; p. 99, lines 1 – 14.

[2] **Trial testimony of Lai Morrell**, 5/4/10, p. 103, lines 19 – 25; p. 104, lines 1 – 6.

[3] **Trial Exhibit 8, Trial Exhibit 9.**

[4] **Trial testimony of Lai Morrell**, 5/4/10, p. 138, lines 11 – 25; p. 139, lines 1 – 25; p. 140, lines 1 – 16, 19 – 25; p. 141, lines 1 – 25; p. 142, lines 1 – 25; p. 143, lines 8 -25; and p. 144, lines 1- 8.

[5] **Trial Exhibit 172.**

[6] **Trial testimony of Lai Morrell**, 5/5/10, p. 2, lines 9 – 25; p. 3, lines 1 – 25; p. 4, lines 1 – 25; p. 5, lines 1 – 25; p. 6, lines 1 – 25; p. 7, lines 1 – 25; and p. 8, lines 1 -16. **Trial Exhibit 103; Trial Exhibit 171; Trial Exhibit 508; Trial Exhibit 677; Trial Exhibit 678.**

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 1
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

the loss reserves due under the policy.[7] Indeed, there was no evidence presented by defendants disputing the amounts required to be paid under the workers' compensation policy, or the loss reserve calculations, or the amount still due and unpaid.

All the payments to Cascade for the policy were made by Midwest Merger Management LLC ("Midwest") and identified as workers' compensation payments by Midwest on its remittances.[8] The total paid to Cascade for the workers' compensation policy based on Cascade's books and records and Midwest's remittances is $8,091,321.22.[9] Again, there was no evidence presented by defendants disputing the amounts that were actually paid by Midwest for the policy. The ultimate amount for the policy totals $27,402,065.22, of which only $8,091,321.22 has ever been paid. The amount due and unpaid is $19,310.744.00.

**B.    Unjust Enrichment against Defendants Midwest Merger Management LLC, Danny Pixler, Anthony Huff, and Sheri Huff**

Cascade provided a full year of workers' compensation coverage to defendants' business enterprise.[10]    Each of the defendants[11] received the benefits of having sold that workers' compensation coverage to the co-employers and their approximately 15,000 workers, who paid for that coverage to ASRC,[12] which was then passed over in full to Midwest.[13]  However, the defendants did not pay for the product and services which were in fact fully provided by

---

[7] **Trial testimony of Charles McClenahan**, expert actuarial, 5/11/10, p. 14, lines 7 – 25; p. 15, lines 1 – 3, 24 – 25; p. 16, lines 1 – 12, 19 – 25; p. 17, lines 18 – 25; p. 18, lines 1 – 4.

[8] **Trial testimony of Lai Morrell**, 5/4/10, p. 112, lines 22-25; p. 113, lines 1 – 25; **Trial Exhibit 170** (sample remittance).

[9] **Trial testimony of Lai Morrell**, 5/4/10, p. 134, lines 11 – 25; p. 135, lines 1 – 25; p. 136, lines 1 – 25; **Trial Exhibit 101A** (listing of all payments for workers' comp program).

[10] There was no dispute that the insurance coverage ran for one year starting 2/13/04 and that Cascade provided a full year of coverage. **Trial testimony of Anthony Huff**, 5/18/10, p. 40, lines 1 – 6.

[11] *See also* Section E below on piercing the corporate veil of Midwest as to personal liability of the individuals.

[12] **Trial testimony of Anthony Huff**, 5/18/10, p. 40, lines 11 – 18 (No dispute that ASRC received money from the co-employers and employees for workers' comp, and the money paid was intended to provide full coverage).

[13] *See* Section C below on amounts paid over to Midwest from ASRC, the PEO.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 2
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Cascade.[14] Defendants received all the benefits of the insurance, received payment for it, and received the benefits of having an on-going business operation for which workers' compensation insurance was integral and necessary, but they did not pay for that insurance coverage.

Unjust enrichment is an equitable remedy providing a method for recovery for the value of the benefit conferred on defendants who have accepted and retained that benefit. It is inequitable to retain the benefit without the payment of its value. Unjust enrichment applies where one party retains money or benefits for which it has not paid. *Young v. Young*, 164 Wn.2d 477, 484-85, 191 P.3d 1258 (2008) (citing *Lynch v. Deaconess Medical Center*, 113 Wn.2d 162, 165, 776 P.2d 681 (1989), and *Bailie Comm. Ltd. v. Trend Business Systems, Inc.*, 61 Wn. App. 151, 159-60, 810 P.2d 12 (1991)). "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young*, *Id.* at 484.

The proper measure of recovery for unjust enrichment is the value of the services provided. *Id.* at 487. The proper amount is determined by the value of the benefit conferred, or what the services would have cost if obtained from another party in plaintiff's position, or by the extent to which the defendant's property increased in value or its other interests were advanced. *Id.*

Here, Danny Pixler and Anthony Huff desperately needed workers' compensation coverage for the co-employees in order to keep and grow their operations in California,[15] which

---

[14] **Trial testimony of Anthony Huff**, 5/18/10, p. 40, lines 7 – 10 (Cascade performed and provided all the insurance coverage at issue in this case).

[15] **Trial testimony of Thomas Bean**, video deposition, p. 92, lines 7 – 23 (needed workers' comp insurance or PEO business stop; urgent need to get coverage). **Trial testimony of Eugene Weiss**, video deposition, p. 47, lines 11 – 15 (Pixler wanted to expedite process due to need for workers' compensation coverage). **Trial testimony of Danny Pixler**, video deposition, p. 145, lines 4 – 7; p. 146, lines 23 – 25; p. 147, line 1; p. 153, lines 11 – 13; p. 154, lines 4 – 5; p. 364, lines 8 - 17 (looking for carrier licensed in CA, only option to find

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 3
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

provided revenue to their business enterprise, and which provided huge sums of workers'
compensation insurance premiums and fees.[16] Those premiums and fees were paid immediately
and in full over to Midwest, which was operated and controlled by them. Defendants received the
benefits of the insurance coverage for their enterprise, and they received the millions of dollars of
premiums and fees due Cascade. But they failed and refused to pay the amounts due for the
insurance coverage provided by Cascade. It is inequitable for defendants to have received and
retained the benefit of full insurance coverage for their business enterprises, for which they were
paid, but not to pay the value of that product to plaintiff.

Under the doctrine of unjust enrichment, the Court should award plaintiff the full amount
still due and unpaid of $19,310,744.00, which should be awarded against Midwest, Danny Pixler,
Anthony Huff, and Sheri Huff, jointly and severally. *See also Section E* below on piercing the
corporate veil/corporate disregard.

C.    **Constructive Trust against Defendants Midwest Merger Management LLC,
Danny Pixler, Anthony Huff, and Sheri Huff**

Thomas Cunningham is an accountant who oversaw the accounting department of
Certified Services, was responsible for the financial books of ASRC, functioned as VP of Finance
for Certified from late 2002 to February, 2006,[17] and continued primarily to work as an
accountant for enterprises of Anthony Huff.[18] He testified that ASRC was paid money from its
employer-clients for workers' compensation coverage for the co-employees, and ASRC/Certified

---

insurer already licensed, CURCO in place through mid February, 2004, when Cascade stopped coverage in 2005,
ASRC was out of business.

[16] **Trial testimony of Paul Sutphen**, 5/10/10, p. 20, lines 23 – 25; p. 21, lines 1 – 2 ($122 million for 2001 –
2005 in workers' comp revenue).

[17] **Trial testimony of Thomas Cunningham**, video deposition, p. 5, lines 5-6; p. 21 – 22; p. 40, lines 16 – 22.
**Trial testimony of Danny Pixler**, video deposition, p. 25, lines 3 – 7; p. 26, line 25; p. 27, line 1.

[18] **Trial testimony of Thomas Cunningham**, video deposition p. 5, lines 14 – 25; p. 6, lines 1 – 14; p. 7, lines 1
– 16.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 4
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

immediately paid <u>all</u> the workers' compensation payment money over to Midwest.[19]  <u>All</u> the workers' compensations dollars, the amount the employer-client paid, were sent to Midwest, like a "pass through", and paid to Midwest daily as received.[20]  He acknowledged that ASRC/Certified "entrusted" its workers' comp funds to Midwest.[21]

The Certified Consolidated Statements for the periods ending 6/30/04, 9/30/04, and year ended 12/31/04[22] were maintained by Cunningham and are final and accurate; and they reflect for calendar year 2004 that an amount of $14,027,700 for workers' compensation from ASRC's employer-clients was "paid over" or "just passed through" to Midwest.[23]  The ASRC employer-clients would pay the billed amount on or before the date the payroll was paid out to workers,[24] meaning that the workers' comp "billings" reflected on the Consolidated Statement were in fact paid, and were in fact paid *prior to* any payroll payments by ASRC to the workers.[25]  Midwest took all the workers' compensation amounts from the ASRC employer-clients.[26]

---

[19] **Trial testimony of Thomas Cunningham**, video deposition, p. 59, lines 17 – 25 (all dollars paid to Midwest, Midwest responsible to satisfy all claims); p. 60, lines 23 – 25; p. 61, lines 1 – 2 (Certified collected money from employer clients, remitted over to Midwest to cover all workers' comp risk); p. 64, lines 8 – 18 (Certified would calculate premium or costs for workers' comp program, would send 3.5% of payroll including workers' comp premium coverage to Midwest, Midwest would disperse to carrier).

[20] **Trial testimony of Thomas Cunningham**, video deposition, p. 101, lines 14 – 25; p. 102, lines 1 – 6.

[21] **Trial testimony of Thomas Cunningham**, video deposition, p. 65, lines 17 – 19.

[22] **Trial Exhibit 100**.

[23] **Trial testimony of Thomas Cunningham**, video deposition, p. 128, lines 23 – 25; p. 129, lines 1, 23 – 25; p. 130, lines 1 – 6; p. 133, lines 9 – 13; p. 136, lines 8 – 18; p. 144, lines 7 – 13.

[24] **Trial testimony of Thomas Cunningham**, video deposition, p. 64, lines 24 – 25; p. 65, lines 1 – 3.

[25] **Trial testimony of Anthony Russo**, video deposition, p. 133, lines 23 – 25; p. 134, lines 1 – 2 (Midwest paid insurers *after* the money flowed into Midwest from Certified.) **Trial testimony of Paul Sutphen**, 5/10/10, p. 23, lines 2 – 7 (Payments by Midwest to Cascade made *after* the workers' comp money came in from ASRC/Certified to Midwest, contrary to Huff's unsupported claim that Midwest was *advancing* payments to Cascade for ASRC).

[26] In addition to the cited Cunningham testimony above, this was also confirmed by **trial testimony of Thomas Bean**, video deposition, p. 9, lines 12 – 16; p. 70, lines 1 – 10 (workers' comp premiums billed and collected from clients were remitted to Midwest); p. 81, lines 2 – 9 (received by Certified and then paid over to Midwest, not pre-paid by Midwest to carriers); p. 144, lines 3 – 17, 25; p. 145, lines 1 – 8 (ASRC received payments from clients before processed and paid payroll; ASRC would have money in hand or within a short time period before paid payroll to employees.)

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 5
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

For calendar year 2004, the total amount billed and paid over to Midwest was $14,027,700, but the policy and payments from ASRC's employer-clients to Midwest continued through February 14, 2005,[27] for another month and one-half of payments to Midwest. Based on the collections for 2004, the extra month and one-half would add $1,753,462 in insurance payments for 2005 that the ASRC employer-clients paid over to Midwest. Therefore, the amount of workers' comp funds that Midwest received from ASRC/Certified was $14,027,700 through 12/31/04, plus $1,753,452 for the period of 1/1/05 to 2/14/05, for a total of $15,781,152 in workers' comp premiums and fees turned over to Midwest.

The total of all payments made by Midwest to Cascade for the workers' compensation policy coverage is $8,091,321.22.[28] Thus, Midwest received and kept a net total of $7,689,831.00 of workers' compensation premiums and fees from ASRC/Certified and did not pay that over to Cascade for the workers' compensation policy Cascade provided.

A constructive trust is an equitable remedy imposed when one should not in fairness be allowed to retain property of another. *Goodman v. Goodman*, 128 Wn.2d 366, 371-72, 907 P.2d 290 (1995); *Consulting Overseas Management, Ltd. v. Shtikel*, 105 Wn. App. 80, 86-87, 18 P.3d 1144 (2001). Courts impose constructive trusts in instances of fraud, misrepresentation, or bad faith, or for wrongful taking and retention of property. *Shtikel, Id.* at 105 Wn. App. at 87. The imposition of a constructive trust is with regard to the property or sums taken and retained. Here, Midwest took possession of all premium and fee payments[29] made by ASRC employer-clients for

---

[27] **Trial testimony of Anthony Huff**, 5/18/10, p. 25, lines 23 – 25; p. 26, lines 1 – 2, 6 – 8 (Program continued after 12/31/04, to 2/13/04, and more workers' comp payments were made for fiscal year 2005)

[28] **Trial testimony of Morrell**, 5/4/10, p. 134, lines 11 – 25; p. 135, lines 1 – 25; p. 136, lines 1 – 25; **Trial Exhibit 101A** (listing of all payments for workers' comp program). *See also,* Section A above.

[29] "Premium" means all sums charged, received, or deposited as consideration for an insurance contract or the continuance thereof. RCW 48.18.170; California Insurance Code Sec, 1733. **Trial Exhibit 15** (p. 015-033 policy defines "premium" as all amounts to be paid, loss reserves, IBNR, fees, assessments, claims incurred)

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 6
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

the workers' compensation insurance, which insurance was fully provided by Cascade. Those amounts were due to Cascade and belonged to Cascade – and in fairness a constructive trust must be imposed as to those amounts taken and retained and not paid over to Cascade.

There is an additional basis for imposing a constructive trust over the sums retained by Midwest -- they were insurance premiums. The business of insurance is highly regulated in every state to protect the public interest.[30] Premiums and fees paid for insurance coverage are to be carefully guarded, specially treated, and preserved for the insurance carrier to whom they are due and to whom they belong. All funds received by any person as a premium on or under any policy of insurance are received and held by that person in his or her fiduciary capacity. Fiduciary capacity means holding property or assets *in trust* for another.[31]

Further, Midwest was in fact acting as an insurance agent or broker[32] in taking the insurance premiums and fees from the ASRC employer-clients, yet it failed to be licensed as such, avoiding regulation and financial oversight. One of the primary aims of regulation is to make certain that premiums are not dissipated, mishandled, squandered, or misappropriated. Midwest's conduct in taking and retaining premiums from ASRC for the workers' compensation provided by Cascade is thus contrary to public policy.

Under the claim of constructive trust, the Court should award to plaintiff the net amount of premiums received and not paid over to Cascade of $7,689,831. This amount should be

---

[30] RCW 48.01.030 provides that the business of insurance affects the public interest and requires persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters; and have a duty to preserve inviolate the integrity of insurance.

[31] RCW 48.17.030(3); California Insurance Code Sec.1733.

[32] "Insurance Broker" means any person who, on behalf of the insured, for compensation as an independent contractor, for commission, or fee, solicits, negotiates, or procures insurance, or in any manner aids therein, for insureds or prospective insureds other than himself. RCW 48.17.020 (in effect at time of underlying events).

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 7
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

1    awarded against Midwest, Danny Pixler, Anthony Huff, and Sheri Huff, jointly and severally. *See*

2    *also Section E* below on piercing the corporate veil.

3        **D.    Promissory Estoppel against Defendants Midwest Merger Management LLC**

4    **and Danny Pixler**

5        Promissory estoppel is a promise which the promissor should reasonably expect to induce

6    action or forbearance of a definite and substantial character on the promise, and which does

7    induce such action or forbearance and is binding if injustice can be avoided only by enforcement

8    of the promise. *Restatement, Contracts* § 90 (1932), *cited in Corbit v. J.I. Case*, 708 Wn.2d 522,

9    538, 424 P.2d 290 (1967). The claim consists of: (1) a promise which (2) the promissor should

10   reasonably expect to cause the promise to change his position, and (3) which does cause the

11   promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5)

12   injustice can be avoided only by enforcement of the promise. *Id.*

13       Pixler pushed for the workers' compensation program to be in place immediately, and was

14   in a big rush, wanting to expedite the process, as he desperately needed workers' compensation

15   coverage due to problems he was encountering covering workers in California under his CURCO

16   program.[33] Pixler acknowledged that he intended that Anderson rely upon what he told him

17   during the time period of November-December 2003 and early January 2004, at the time that the

18   agreements were being negotiated.[34]

19

20

21

22

23   _____

[33] **Trial testimony of Eugene Weiss**, video deposition, p. 47, lines 11 – 15. **Trial testimony of Thomas Bean**,
24   video deposition, p. 92, lines 7 – 23. **Trial testimony of Lai Morrell**, 5/4/10, p. 110, lines 3 – 25 (Pixler
     pressured Cascade to get program together to move workers from CURCO, wanted to move very fast). **Trial**
25   **testimony of John Ference**, 5/ 5/10, p. 49, lines 9 – 19. **Trial testimony of Danny Pixler**, video deposition, p.
     142, lines 12 – 18; p. 144, lines 24 – 25; p. 145, lines 1 – 3.

26   [34] **Trial testimony of Danny Pixler**, video deposition, p. 176, lines 9 – 13.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 8
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Pixler stated that he and his group of companies would be responsible to Cascade for the ASRC workers' comp program.[35]  Pixler stated to Anderson that he and his wife owned Midwest.[36] Certificates of insurance were issued obligating Cascade to provide the workers' compensation coverage as of February 13, 2004.[37] Pixler stated later that Midwest was their overall money manager and risk manager.[38]

During the events involving adding Mainstay as a policyholder in June, 2004,[39] Anderson also challenged Pixler as to why Midwest was collecting the premiums and fees for the workers' compensation coverage from ASRC/Certified. At that time, when he learned that the premium money went to Midwest instead of directly to Cascade, he was then introduced to Anthony Huff who told him that Midwest was the risk manager, that they stood behind and that they pay their bills.[40] Anderson was convinced, cajoled, manipulated and reassured by Huff that they were good for the payments, were highly successful, had been around a number of years,[41]  that he was a Christian like Anderson (even quoting Bible verses to Anderson),[42] and that his criminal *charges* would be expunged by year end.[43] To emphasize his commitment, Huff specifically reassured Anderson to contact him <u>directly</u> if there were problems with getting timely payments for the

---

[35] **Trial testimony of Lai Morrell, 5/4/10, p. 105, lines 20 – 25.**

[36] **Trial testimony of Harold Anderson, 5/6/10, p. 22, lines 10 – 12.**

[37] **Trial testimony of John Ference, 5/5/10, p. 49, lines 10 – 16.**

[38] **Trial testimony of Harold Anderson, 5/6/10, p. 24, lines 20 – 24; p. 25, lines 2 – 5.**

[39] The Mainstay event is when Pixler made the written proposal to Mainstay that Cascade would provide workers' compensation insurance to Mainstay with the premium going from Mainstay to Midwest, instead of directly to Cascade, which Anderson questioned and stopped. **Trial testimony of Harold Anderson,** 5/6/10, p. 37, lines 19 – 25; p. 38, lines 1 – 17. **Trial testimony of Danny Pixler,** video deposition, pp. 248 – 552, **Trial Exhibit 699.**

[40] **Trial testimony of Harold Anderson, 5/6/10, p. 48, lines 4 – 9; page 49, lines 11 -21.**

[41] **Trial testimony of Harold Anderson, 5/6/10, p. 41, line 8.**

[42] **Trial testimony of Harold Anderson, 5/6/10, p. 45, lines 13 – 25.**

[43] **Trial testimony of Harold Anderson,** 5/6/10,  p. 46, lines 9 – 25. (Anderson was told *charges* only, but at that time, there had been a criminal conviction due to the plea in May, 2003, and the sentencing in May, 2004. **Trial Exhibit 59.**)

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 9
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

coverage.[44]  Because Anderson was expressing concerns, Anthony Russo was introduced to him specifically and expressly to give credibility to the operations.[45] Later, in October, 2004, Anthony Huff again reassured and promised Anderson that there was money to pay the worker's compensation coverage.[46]  Huff was very convincing, both in the July and October meetings, and Anderson believed him.[47]

Pixler and Anthony Huff both made repeated commitments and promises that they and Midwest stood behind the obligations to Cascade, which was intended to induce or cause Cascade to act or forbear from acting, and which in fact did induce Cascade to provide the workers' compensation coverage and continue with the program.  Cascade's reliance was justifiable -- the promises and repeated commitments of Pixler, combined with the initial concealment of Huff or his involvement and then the false representations about Huff's criminal conviction even when specifically questioned, and Huff's repeated commitments all created an environment in which reliance by and inducement of Cascade is even more compelling. Under the circumstances here, injustice can only be avoided by enforcement of the promises against Pixler and Midwest, as well as against Anthony Huff, Sheri Huff and Danny Pixler under the doctrine of piercing the corporate veil.

Under the claim of promissory estoppel, the Court should award to plaintiff the full amount of premiums and fees unpaid of $19,310,744.00. This amount should be awarded against Midwest, Danny Pixler, Anthony Huff, and Sheri Huff, jointly and severally.  *See also Section E* below on piercing the corporate veil.

---

[44] **Trial testimony of Harold Anderson**, 5/6/10, p. 50, lines 1 – 4.

[45] **Trial testimony of Anthony Russo**, video deposition, p. 92, lines 13 – 25; p. 93, lines 1 – 9.

[46] **Trial testimony of Harold Anderson**, 5/6/10, p. 55, lines 6 - 25.

[47] **Trial testimony of Harold Anderson**, 5/6/10, p. 47, lines 1 – 20; p. 123, lines 17 – 24.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 10
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

### E.    Piercing the Corporate Veil/Disregard of Corporate Entity Against Defendants Anthony Huff, Sheri Huff, and Danny Pixler

Plaintiff seeks entry of judgment against the individual defendants on the basis of piercing the corporate veil for all causes of action found by the jury against Midwest, even where the individual was found not personally liable and even where the individual was also found personally liable on such claim (i.e. breach of third party beneficiary contract, violation of the Consumer Protection Act, violation of the Criminal Profiteering Act, and misappropriation). In addition, plaintiff seeks entry of judgment against the individual defendants on the basis of piercing the corporate veil on all the equitable claims to be found by the Court as argued herein (i.e. unjust enrichment, constructive trust, and promissory estoppel).

Midwest was formed as a limited liability company ("LLC") organized under the laws of the State of Kentucky, which is undisputed. An LLC is subject to the same principles for corporate disregard as a corporation. Under Kentucky case law, the rules for disregard of the corporate entity are summarized in *Sudamax v. Buttes & Ashes,* 516 F. Supp. 2d 841 (W.D. Ky. 2007) at 847-848:

> The corporate veil should not be pierced unless there is (1) "such a unity of ownership and interest" that the separate personalities of the corporation and its owner cease to exist, and (2) "the facts are such that an adherence to the normal attributes . . . of separate corporate existence would sanction a fraud or promote injustice." *White v. Winchester Land Development Corp.,* 584 S.W. 2d 56, 61-62 (Ky. App. 1979). *See also* 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations, § 41.30 (perm. ed. rev. vol. 1990). "[T]he first element focuses on the relationship between the corporation and the owners or other corporate actors, while the second element concerns the relationship between the corporation and the plaintiff." *Thomas v. Brooks,* 2007 WL 1378510, *3 (Ky.App. May 11, 2007). In deciding whether to pierce the veil, courts have identified several factors bearing on the first element: "(1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends (4) a siphoning off of funds by the dominant shareholder(s); and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities." *White,* 584 S.W. 2d at 62. "No single factor is dispositive, and generally several must be present to justify piercing." *Thomas,* 2007 WL 1378510, *3.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 11
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

The *White* case, cited in the *Sudamax* opinion above, identifies various theories to hold the individual liable. Under the instrumentality theory, piercing the veil will occur where the entity is a mere instrumentality of the owner who exercised control over it in such a way to defraud or harm plaintiff, and the refusal to disregard the corporate entity would subject the plaintiff to unfair loss. Under the *alter ego* theory, piercing the veil will occur when there is such unity of ownership and interest that the separateness has ceased to exist, and treatment as a separate entity would promote an injustice or sanction fraud. Under the equity formulation analysis, whether to pierce depends on equities present in the case.

The rules and standards under Washington case law are similar. The corporate entity will be disregarded where the domination by the individual is so complete that the corporate entity has no separate mind, will or existence of its own, and is a business conduit for its principal. *J.I. Case Credit Corp v. Stark,* 64 Wn.2d 470, 392 P.2d 215 (1964). The entity will be disregarded, in order to protect against a wrong or injustice to plaintiff, where the funds and property are so controlled that the entity was merely an instrumentality of the individual. *Soderberg Advertising v. Kent-Moore Corp.,* 11 Wn. App. 721, 524 P.2d 1355 (1974).

The corporate veil of a company will be pierced where there was intentional abuse of the corporate form to violate a duty owed to an injured party – where the company has been intentionally used to violate or evade a duty owed to another. *Morgan v. Burks*, 93 Wn.2d. 580, 585, 611 P.2d 751 (1980). It is an equitable remedy utilized to prevent unjustified loss to the injured party. *Meisel v. M&N Modern Hydraulic Press Co.*, 97 Wn.2d 403, 410, 645 P.2d 689 (1982).

The courts look at a variety of circumstances to determine whether to apply the doctrine. For example, serious confusion about the manner and capacity in which a parent and subsidiary company or their respective representatives are acting will be taken into account in piercing the corporate veil. *Morgan Bros. v. Haskell Corp.*, 24 Wn. App. 773, 778, 694 P.2d 1294 (1979).

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 12
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

The same is true where there is a commingling of property rights or interests indicating that entities are intended to function as one, under circumstances where regarding entities as separate would work a wrong upon others. *J.I. Case Credit Corp. v. Stark*, 64 Wn.2d. 470, 475, 392 P.2d 215 (1964). Where funds and property are so dominated and controlled that the entity had no separate mind, will, or existence of its own, and was merely an instrumentality and business conduit for its principal, courts will apply the doctrine of corporate disregard to protect against a wrong or injustice to a plaintiff. *Soderberg Advertising v. Kent-Moore Corp.*, 11 Wn. App. 721, 733-34, 524 P.2d 1355 (1974).

As detailed herein and cited to the record, (1) Midwest was used as the device to conceal the existence, involvement and control of Anthony Huff, which essentially enabled the workers' compensation policy to be issued by Cascade, (2) Midwest took possession of all the workers' compensation premiums and fees from ASRC and its employer-clients, (3) Cascade was not paid for the insurance coverage it fully provided to ASRC and its employer-clients, (4) Midwest did not follow corporate formalities, and (5) Midwest was used to siphon off thousands of dollars to the individual defendants. The evidence also shows that Midwest is presently defunct – although it is still in existence – and all of its assets have been dissipated or transferred and it is a mere shell.[48] Piercing the corporate veil of Midwest is necessary to prevent unjustified loss. Otherwise, the individual defendants will have succeeded in establishing and using the entity, Midwest, to evade or violate the duty and obligation owing to Cascade, and to walk away with hundreds of thousands of dollars for personal gain, including diverted premiums owed to Cascade.

There is an abundance of evidence to support disregard of the corporate form here. Anthony Huff and Danny Pixler put together the idea to form Midwest, formed it to buy other

---

[48] **Trial testimony of Anthony Russo**, video deposition, p. 32, lines 21 – 25; p. 33, lines 1 -12 (Midwest in existence but inactive since at least October, 2006). **Trial testimony of Roxann Pixler**, video deposition, p. 68, lines 10 – 14 (Midwest is not dissolved, but is not conducting business).

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 13
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

companies,[49] and intentionally put it in the names of their wives to conceal their actual ownership interests and to protect their assets from creditors. [50] There were no capital contributions made by the members,[51] and no assets in Midwest until it started getting weekly insurance checks from Certified Services, Inc.[52]

Midwest did not follow any regular or standard corporate formalities: (1) There were no members or managers named in the Articles of Organization,[53] and the Organizational Meeting report, Operating Agreement, and tax returns all reflected different number of members (some two, some three), and different ownership percentages.[54] (2) Many documents were signed without authority or knowledge of the named members.[55] (3) There were no meetings, minutes,

---

[49] **Trial testimony of Roxann Pixler**, video deposition, p. 25, lines 17 – 25; p. 26, lines 1 – 3; p. 27, lines 12 – 25; p. 28, lines 1 – 5;

[50] **Trial testimony of Danny Pixler**, video deposition, p. 48, lines 21 – 25; p. 49, lines 1 – 11; p. 51, lines 4 – 13, 25; p. 52, lines 1 – 8, 19 - 22. **Trial testimony of Anthony Huff**, 5/13/10, p. 4, lines 18 – 21; p. 9, lines 2 – 5 (to keep assets from being in his name). **Trial testimony of Sheri Huff**, video deposition, p. 7, lines 13 – 16; (divorced in 93-94; considered married, held selves out as married). **Trial testimony of Anthony Russo**, video deposition, p. 104, lines 13 – 23 (set up under wives names to protect assets). Huff stated was putting Midwest in Sheri Huff's name, **Testimony of Danny Pixler**, p. 52, lines 23 – 25; p. 53, lines 2 – 3.

[51] **Trial testimony of Michele Brown**, video deposition, p. 29, lines 21 – 24 (no money contribution by Brown); **Trial testimony of Sheri Huff**, video deposition, p. 17, lines 18 – 21 (no money contribution by Sheri Huff). **Trial testimony of Roxann Pixler**, video deposition, p.43, lines 3 – 10 (no personal or joint capital contribution by R. Pixler).

[52] **Testimony of Michele Brown**, video deposition, p. 11, lines 8 -23.

[53] **Trial testimony of Michele Brown**, video deposition, p. 24, lines 22 – 25; p. 25, line 1, 13 – 24.

[54] **Trial testimony of Roxann Pixler**, video deposition, p. 33, lines 18 – 25; p. 34, lines 1 – 3, 5 – 25; p.35, lines 1 – 12; p. 69, lines 2 – 12 (document she signed in her file has two members, S. Huff and R. Pixler each with 50% interest, but document with Midwest shows S. Huff at 59%, R. Pixler at 40%, and Michele Brown at 1%; and Articles of Organization show only two members, does not know even what percentage she actually owned). **Trial testimony of Michele Brown**, video deposition, p. 26, lines 14 – 25; p. 28, lines 24 – 25; p. 29, lines 3 – 15; p. 41, lines 1 – 11; p. 42, lines 1 – 11; p. 52, lines 10 – 14; p. 53, lines 1 – 19; p. 54, lines 19 – 25; p. 55, lines 1 – 11, 16 – 21;  (Operating Agreement has different percentage ownership than other documents, including 2002 and 2003 Tax Returns, and no knowledge why or how numbers changed. **Trial testimony of Sheri Huff**, video deposition, p. 24, lines 19 – 25; p. 25, lines 1 – 6 (no knowledge why percentage ownership different in 2002 Midwest tax return).

[55] **Trial testimony of Roxann Pixler**, video deposition, p. 50, lines 1 – 16, 24 – 25; p. 52, lines 2 - 5 (no knowledge of resolution that Brown could execute binding documents for all members; not R. Pixler's signature on document); p. 76, lines 15 – 19 (no authorization for non-member to execute Midwest 2004 tax return). **Trial testimony of Sheri Huff**, video deposition, p. 16, line 4 – 12, 17 - 19 (not her signature, not recall telling anyone to sign for her).

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 14
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

or discussions of business operations between the named members or managers.[56] (4) No certificates of ownership were ever issued.[57]

It was clear that Midwest was controlled principally by Anthony Huff,[58] along with Danny Pixler. But Huff's name was not on any public documents regarding Midwest.[59] Michele Brown, Huff's secretary, signed nearly all necessary documents for Midwest but only at Huff's direction – he told her whether and what to sign, as she had no idea.[60] Huff used Brown to operate Midwest as a means to conceal his actual control and ownership. Brown signed Midwest documents for Sheri Huff, and had blanket authority – Sheri Huff told her she could sign her name on anything that Anthony Huff said to sign.[61]

Due to his criminal history, Huff could not be an owner or be an ultimate controlling person on any business enterprise associated with insurance, and would not qualify on a Form A filing with insurance regulators.[62] Huff and Charlie Spinelli, identified as his attorney[63] and a

---

[56] **Trial testimony of Roxann Pixler**, video deposition, p. 46, lines 22 – 25; p. 48, lines 17 – 21; p. 49, lines 10 – 16; p. 54, lines 19 – 25; p. 55, lines 1 – 5, 21 – 25; p. 56, line 1, 18 – 22; p. 57, lines 2 - 5; p. 98, lines 12 – 17 (never discussed business of Midwest, or with S. Huff or M. Brown, did nothing as manager/member, no meetings, no minutes seen or approved). **Trial testimony of Sheri Huff**, video deposition, p. 20, lines 15 – 17 (not attend meetings of members).

[57] **Trial testimony of Roxann Pixler**, video deposition, p. 62, lines 14 – 17. **Trial testimony of Sheri Huff**, video deposition, p. 25, lines 7 – 12.

[58] **Trial testimony of Anthony Russo**, video deposition, p. 81, lines 10 – 11; p. 103, lines 8 – 21; p. 104, lines 13 – 23; p. 105, lines 7 - 11 (Midwest was A. Huff's company, A. Huff in control and most dominant at Midwest, was set up under wives names to protect their assets, Huff family income all channeled to Sheri Huff). **Trial testimony of Thomas Cunningham**, video deposition, p. 33, line 10; p. 34, line 11 (Huff in charge of Midwest, was Pixler's superior).

[59] **Trial testimony of Anthony Huff**, 5/13/10, p. 5, lines 18 – 24 (in Midwest filings with state, A. Huff not listed as controlling person or manager); p. 6, lines 1 – 5; p. 4, lines 22 – 25 (knew regulators look to controlling interests of purchasers in insurance transactions); p. 5, lines 1 – 5 (before indicted, was publicly named on entities, acknowledged negative background must be disclosed).

[60] **Trial testimony of Michele Brown**, video deposition, p. 106, lines 15 – 25; p. 107, lines 1 – 8. **Trial testimony of Anthony Russo**, video deposition, p. 110, lines 5 – 8 (Brown executes all documents A. Huff requires to do business).

[61] **Trial testimony of Michele Brown**, video deposition, p. 134, lines 3 – 8, 13 – 16, 25; p. 135, lines 1 – 7; p. 137, lines 18 – 22; p. 138, lines 2 – 15; p. 139, lines 1 – 5, 11 – 17 (signed contracts and declaration). **Trial Exhibit 83. Trial testimony of Anthony Huff**, 5/13/10, p. 23, lines 116 – 18 (Has agreement with S. Huff that he will take care of her financially for her life); p. 24, lines 4 – 7 (Has authority to sign her name, make all decisions in business matters).

[62] **Trial testimony of Anthony Russo**, video deposition, p. 47, lines 11 – 25; p. 48, lines 1 – 12; p. 51, lines 14 – 24. **Trial testimony of James Tompkins**, 5/7/10, p. 3, lines 11 – 24; p. 9, lines 17 – 25; p. 10, lines 1 – 21.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 15
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

business partner, used others for the Form A filings, purposefully to hide the identity of Huff.[64] After it was formed, Midwest was then used to acquire Certified Services, Inc. in 2001; and Danny Pixler was put in as President of Certified and acted as its CEO.[65]  Certified then began acquiring PEOs.[66] Midwest and Certified then entered into the Risk Allocation Agreement, devised and negotiated by Huff and Pixler,[67] which provided the vehicle, means and method for delivery to Midwest of <u>all</u> the workers' compensation premiums and fees received from the employer-clients of the Certified PEOs.[68]  Between 2001 and 2005, Midwest took possession of at least $122 million[69] of workers' compensation premiums and fees from the PEOs of Certified, which included premiums and fees from ASRC.[70]

These funds were commingled and deposited into Midwest's bank account – without regulation or audit[71] -- and were used extensively and blatantly for non-business, personal expenses of Sheri Huff, Anthony Huff, and for other Huff family enterprises and activities.[72]

---

[63] **Trial testimony of Anthony Huff**, 5/13/10, p. 12, lines 2 – 4.

[64] **Trial testimony of Anthony Russo**, video deposition, p. 54, lines 1 – 5.

[65] **Trial testimony of Danny Pixler**, video deposition, p. 57, lines 12 – 14; p. 61, lines 1 – 3; p. 68, lines 11 – 16.

[66] **Trial testimony of Danny Pixler**, video deposition, p. 57, lines 12 – 14; p. 60, lines 10 -11; p. 66, lines 13 – 17.

[67] **Trial testimony of Michele Brown**, video deposition, p. 105, lines 24 – 25; p. 106, lines 1 – 11. **Trial testimony of Anthony Russo**, video deposition, pp. 145 – 146.

[68] **Trial Exhibit 11.**

[69] **Trial testimony of Paul Sutphen**, 5/10/10, p. 20, lines 23 – 25; p. 21, lines 1 – 2.

[70] **Trial testimony of Paul Sutphen**, 5/10/10, p. 21, lines 3 – 6; p. 22, lines 4 - 5 (funds not separately accounted as to which PEO, all in one lump sum, in one bank account); p. 57, lines 7 – 16; p. 60, lines 1 – 10, 13 – 22 (all funds lumped together, combined, no accounting for, included money should have gone to Cascade, commingled).

[71] **Trial testimony of Anthony Huff**, 5/13/10, p. 16, lines 23 – 25 (Midwest never audited).

[72] **Trial testimony of Paul Sutphen**, 5/10/10, p. 23, lines 21 – 25; p. 24, lines 1 – 5 (checks to cash, total $2.8 million); p. 24, lines 10 – 25; p. 25, lines 1 – 9 (checks to cash under $10,000 to avoid federal reporting and detection); p. 25, lines 15 – 25; p. 26, lines 1 – 4 (indicates taking from company); p. 26, lines 9 – 21, 24 – 25; p. 27, lines 1 – 4 (set of 15 checks coded to travel of $37,500 not legitimate); p. 27, lines 5 – 10 (cash withdrawals not re-deposited or paid back); p. 33, lines 7 – 15, 23 – 25 (checks over $300,000 to Sheri Huff, between 2/04 – 2/05, total $293,900); p. 34, lines 1 – 7 (records show checks to S. Huff for house payments, credit cards, taxes for home); p. 35, lines 23 – 25; p. 36 – 40 (checks to S. Huff and supporting records demonstrate personal expense, coded to travel to conceal, then later revised to change and conceal); p. 40, lines 1 – 8; p. 42, lines 5 – 25; p. 43, lines 1 – 25; p. 44, lines 1 – 2, 5 – 25; p. 45, lines 1 – 22; p. 46, line 1 (checks to Sears, for survey, for insurance not legitimate; check to S. Huff and notes show monthly deposits to her, house payment, and then modified to conceal); p. 47, lines 22- 25; p. 48, lines 1 – 2 (checks to Huff Farms $674,932.38 for 1/1/04 –

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 16
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Danny Pixler also received money and benefits from Midwest's accounts.[73]  However, the financial records of Midwest were a "mess,"[74] and had been manipulated and falsified to conceal personal, non-business expenses through lack of recordkeeping, revisions to financial records, and coding expenses under various categories to give the appearance of legitimate business expenses.[75]

Michele Brown, the secretary who answered phones, ran the Midwest office and paid bills,[76] was also named a member/manager of Midwest and given a 1% interest by Anthony Huff.[77]  As to what pay with Midwest funds, Brown took direction from Anthony Huff and Danny Pixler.[78]  She paid what Huff brought to her.[79]  Anthony Huff told her to write checks and in what amounts from Midwest to Sheri Huff, as did Ms. Huff,[80] and to deposit money from Midwest to Sheri Huff's bank accounts, including the Sheri Huff Brentwood account.[81]  The instructions were oral, with no paperwork or recordkeeping regarding the amount and as to

---

2/11/05, in round amounts, not legitimate); p. 48, lines 15 – 25; p. 49, lines 1 – 25, p. 50, lines 1 – 4 (vendor listings of retailers, not legitimate business expense); p. 50, lines 5 – 19 (political contribution $10,000 paid back to Brown); p. 51, lines 11 – 25; p. 52, lines 1 – 25 (over $1 million coded to travel for 2004, not relate to travel, not legitimate as travel, no explanation in records); p. 53, lines 16 – 19 (not legitimate, someone taking money from company). **Trial Exhibit 166; Trial Exhibit 167.  Trial Exhibit 163** (cash withdrawals up to 5/14/04). **Testimony of Anthony Huff,** 5/13/10, p. 16, lines 17 – 22 (took another $200,000 cash out after 5/14/04).

[73] **Trial testimony of Michele Brown,** video deposition, p. 152, lines 6 – 25; p. 155, lines 9 – 23 (Anthony Huff told Brown amounts to pay him and Pixler, Pixler paid $2500/week).

[74] **Trial testimony of Paul Sutphen,** p. 15, lines 14 – 18; p. 16 – 1 – 9, 11 – 22, 25; p. 17, lines 1 - 6 (ledger a mess, no detail as would be expected, poor quality, late revisions from 2007-08 back to 2003, lack of offsetting transactions); p. 55, lines 24 – 25 (no integrity or reliability in Midwest financial records).

[75] **Trial testimony of Paul Sutphen,** 5/10/10, see footnote 72 above; and p. 28, lines 11 – 25; p. 29, lines 8 – 21; p. 30 (Midwest's QuickBooks showed A. Huff note receivable on hard copy print from 9/12/07, later electronic form had eliminated the note, reclassified as "cash on hand", books changed after close of operations, trying to cover up);  p. 46, lines 24 – 25; p. 47, lines 1 – 19 (recorded personal expenses paid for S. Huff as business expense, to move funds away from company and not repaid); p. 88, lines 13 – 21 ($300,000 to S. Huff without explanation or underlying support). **Testimony of Anthony Russo,** see fn. 87 below.

[76] **Trial testimony of Michele Brown,** video deposition, p. 99, line 25; p. 100, lines 1 – 3.

[77] **Trial testimony of Michele Brown,** video deposition, p. 119, lines 7 – 24.

[78] **Trial testimony of Michele Brown,** video deposition, p. 100, lines 6 – 12; p. 101, lines 10 – 12; p. 103, lines 16 – 25, p. 104, line 1.

[79] **Trial testimony of Michele Brown,** video deposition, p. 90, lines 6 – 12.

[80] **Trial Exhibit 166;  Trial Exhibit 167.**

[81] **Trial testimony of Michele Brown,** video deposition, p. 156, lines 22 – 25; p. 211, lines 1 – 25; p. 213, lines 3 – 5, 6 – 20; p. 214, lines 14 – 21; p. 215, lines 1 – 8, 14 – 21.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 17
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

whether they were legitimate business expenses.[82] At Huff's direction, Brown contributed $10,000 in 2004 from her personal account to the Kentucky Republican Party, and reimbursed herself in full from Midwest's account.[83]

At Huff's direction, Brown daily wrote checks for $7,000-$8,000 to cash, went to the bank daily to cash them, and gave the cash to Huff, where he said he put it in his safe.[84] This occurred in 2002, 2003 and 2004 to September 2004, with total cash withdrawals totaling around $2,750,000.[85] This cash was never paid back or returned to Midwest.[86] But, there were deliberate attempts and changes to the QuickBooks records of Midwest in 2008, four years after the fact, to try to show, falsely, that Anthony Huff had returned the $2.8 million in cash.[87]

The financial books and records of Midwest, consisting principally of QuickBooks program, did "not make sense."[88] They were totally without integrity or veracity, could not be relied upon for any purpose, and would result in inaccurate federal income tax returns.[89] There were numerous payments to non-legitimate business vendors from Midwest's account,[90] and payments of the personal expenses of Sheri or Anthony Huff, or Huff Farms.[91] There were

---

[82] **Trial testimony of Michele Brown**, video deposition, p. 213, lines 6 – 20; p. 214, lines 5 – 8.

[83] **Trial testimony of Michele Brown**, video deposition, p. 148, lines 24 – 25; p. 149, lines 1 – 5; p. 150, lines 14 – 25; p. 151, lines 1 – 4.

[84] **Trial testimony of Michele Brown**, video deposition, p. 160, lines 15 – 25; p. 161, lines 3 – 13, 18 - 20; p. 162, lines 5 – 8, p. 162, lines 10 – 14; p. 163, lines 18 – 20. **Trial testimony of Anthony Russo**, video deposition, p. 164, lines 14 – 25; p. 165, lines 1 – 25; p. 166, lines 1 – 5 ($2.8 million in cash, Huff ran out of room and had to get second vault).

[85] **Trial testimony of Michele Brown**, video deposition, p. 167, lines 23 – 25; p. 168, lines 1 – 11.

[86] **Trial testimony of Paul Sutphen**, 5/10/10, p. 27, lines 5 – 10.

[87] **Trial testimony of Paul Sutphen**, fn. 75 above. **Trial testimony of Anthony Russo**, video deposition, p. 178, lines 17 – 18; p. 179, lines 1 – 20; p. 184, lines 2 – 11, 19 – 25; p. 186, lines 4 – 20; p. 189, lines 3 – 10 (records subpoenaed, "party line" was that Huff deposited the cash back, Brown asked how to show that on the books, changes were made to show Huff paid the money back, lots of changes to books in 2008).

[88] **Trial testimony of Anthony Russo**, video deposition, p. 136, lines 18 – 25; p. 137, lines 1 – 18.

[89] **Trial testimony of Paul Sutphen**, 5/10/10, p. 55, lines 24 – 25; p. 56, lines 1 – 6; p. 57, lines 17 – 22. See also fn. 74 above.

[90] **Trial testimony of Paul Sutphen**, see fn. 72 above.

[91] **Trial testimony of Paul Sutphen**, see fn. 72 above. See also Midwest checks and supporting documentation for dates prior to the transactions with Cascade, identified in the Pretrial Order as Plaintiff's Trial Exhibits 111 – 123, 125 – 139, which Plaintiff moves to admit into evidence for the Court's consideration of this claim. (Checks for personal expenses to Sears, car payments, taxes for Huff's father and Huff trust, deposits to Sheri Huff

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 18

(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

alterations to the records to attempt to falsely show legitimate business expenses or repayments of monies taken.[92]  There was a failure to account for the workers' compensation premiums and fees received from ASRC and due Cascade, which were all commingled with funds from other PEOs or other revenues of Midwest.[93]  Monies were used for non-legitimate business expenses, leaving inadequate money for payment of legitimate obligations;[94] and premiums of Cascade were diverted.[95]  Anthony Huff misused and re-directed money to avoid reporting it on his federal income tax returns.[96]

Due to the state of the financial records of Midwest, it could not have produced a valid financial statement.[97]  However, Midwest did submit a Statement of Estimated Net Worth, one dated 2/24/04 and one dated 7/25/04, to the Washington Insurance Commissioner's office as part of the Form A filings. Brown did not prepare the latter one, but signed it.[98]  The statement dated 2/24/04 reflected significantly lower liabilities and higher assets than the Midwest records and balance sheets.[99]

---

account, and others).  **Trial testimony of Anthony Huff**, 5/13/10, p. 24, lines 10 – 24; p. 25, lines 17 – 20 ($275,000 paid from Midwest for Precept settlement of claim against Huff personally).  **Testimony of Anthony Huff**, 5/13/10, p. 24, lines 10 – 24; p. 25, lines 21 – 24 (paid personal Precept settlement from Midwest funds of $275,000; paid political contribution); p. 16, lines 17 – 22 (took cash out after 5/14/04, another approximately $200,000); p. 20, lines 11 – 15 (Midwest checks for S. Huff Mercedes payments).

[92] **Trial testimony of Paul Sutphen**, see fn. 75 above.

[93] **Trial testimony of Paul Sutphen**, see fn. 70 above.

[94] **Trial testimony of Paul Sutphen**, 5/10/10, p. 59, lines 18 – 25; p. 60, lines 1 – 10, 13 – 17.

[95] **Trial testimony of Paul Sutphen**, 5/10/10, p. 60, lines 18 – 22.

[96] **Trial testimony of Anthony Huff**, 5/13/10, p. 17, lines 1 – 18 (A. Huff consulting fees of $300,000 directly paid to S. Huff, not reported on his income tax); p. 24, lines 10 – 24 (personal liability in Precept settlement of $275,000 not reported as income); p. 17, lines 23 – 24 (reported approximately $50-60,000 income on federal tax returns).

[97] **Trial testimony of Paul Sutphen**, 5/10/10, p. 55, lines 24 – 25; p. 56, lines 1 – 6; p. 88, lines 9 – 12.

[98] **Trial Exhibit 28; Trial testimony of Michele Brown**, p. 158, lines 3 – 12, 23 – 25.

[99] Compare **Trial Exhibit 149, Trial Exhibit 74** and **Trial Exhibit 77.** (The statement submitted to regulators dated 2/24/04, Trial Exhibit 149, also did not include the Anthony Huff Note Receivable, intentionally removed to continue to conceal his identity or to not have any public record of the monies he had taken from Midwest.)  *See* Appendix A attached hereto, where the three trial exhibits are shown and key entries are compared.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 19
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

As cited to the evidence above, Sheri Huff allowed and expressly authorized Anthony Huff to use her name for any purpose, to sign any and all documents on her behalf, and to do whatever was necessary; and Anthony Huff would take care of her financially – and in fact she received a regular allowance and large sums of money deposited into her personal and business bank accounts. She acquiesced and granted authority to Anthony Huff to be her agent for the activities of Midwest, and she received substantial sums in exchange. Indeed, she took her personal bills to Midwest to be paid by Michele Brown, including her personal expenses and home mortgage.

Not only did Danny Pixler aid and enable the creation of Midwest, he also orchestrated with Huff the creation of a big pool of money in Midwest consisting of workers' compensation premiums and fees. He was Huff's partner in the enterprise, and he derived financial gain and benefits from the operations of Midwest. He was paid fees, and received travel, car and other benefits.

The corporate form and formalities were disregarded, the naming of sham members and managers was deliberate and deceiving, there was control by Danny Pixler and ultimate, dominate control by Huff who was not disclosed. Any "separate personality" of Midwest as an entity did not exist, and adherence to normal corporate separate existence would promote injustice.

The case law holding the individuals liable due to disregard of the corporate entity also speaks in terms of the overall circumstances, the equities involved, and the need to prevent injustice and fraud. Danny Pixler cannot deny his involvement in the development of a plan, *via* the Risk Allocation Agreement, to get all the workers' compensation money into Midwest, because he refused to answer <u>any</u> questions concerning that agreement, asserting his 5th Amendment rights.[100] And, only when faced with clear testimony and evidence against him,

---

[100] **Trial testimony of Danny Pixler,** video deposition, p. 70, lines 10 – 23; p. 71, lines 5 – 25; p. 72, lines 1 – 17; p. 73, lines 4 – 19; p. 74, lines 21 – 25; p. 75, lines 1 – 3; p. 76, lines 13 – 23; p. 96, lines 9 – 22; p. 97, lines 4 – 17; p. 97, lines 20 – 25; p. 98, lines 1 – 2.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 20
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

ultimately Anthony Huff finally admitted to taking cash out of Midwest and being the controlling person actually operating Midwest.

Because the monies taken by Midwest from ASRC/Certified were workers' compensation premiums and fees, to prevent injustice and fraud it is necessary to disregard the corporate entity to hold the individuals liable. The business of insurance is highly regulated in every state to protect the public interest,[101] and in particular, premiums and fees for insurance coverage are to be carefully guarded and preserved against misappropriation or misuse. Here, Midwest took the premiums and fees and did not preserve or pay them over to the insurance carrier, Cascade. Further, Midwest took the premiums and fees and accepted the risk of coverage, yet it failed to be licensed as an insurer, or an agent, or a broker, which kept it from financial oversight and regulation. Anyone who receives premiums and fees for insurance coverage must treat them in a fiduciary capacity, and must protect them from being dissipated, mishandled, squandered, or misappropriated.[102]   Midwest's taking and retaining, without proper accounting, of premiums from ASRC for the workers' compensation provided by Cascade is contrary to law. Midwest, by and through the individual defendants, acted inequitably and contrary to public policy and the laws governing insurance transactions by taking, using, commingling, dissipating, and mishandling premiums for insurance.

There is further justification for disregarding the corporate entity, Midwest, and holding the individuals liable – i.e. the criminal charges and conviction of Anthony Huff, of which Danny Pixler was aware.[103]   Huff entered a plea of guilty to three counts of mail fraud in violation of 18 U.S.C.§ 1341,[104] which arose from the misuse and taking of money to be used to pay insurance

---

[101] RCW 48.01.030 provides that the business of insurance affects the public interest and requires persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters; and have a duty to preserve inviolate the integrity of insurance.

[102] See above sections on unjust enrichment and constructive trust.

[103] **Testimony of Danny Pixler**, video deposition, p. 42, lines 18 – 21 (aware of charges as early as 2000, when Huff resigned as Chairman of US Trucking).

[104] **Trial Exhibit 59.**

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 21
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

premiums. The Violent Crime Control & Law Enforcement Act of 1994, 18 U.S.C. § 1033-1034, provides that an "individual convicted of any criminal felony involving dishonesty or breach of trust . . . and who willfully engages in the business of insurance shall be guilty of a crime." Therefore, Huff's involvement in the transactions with Cascade, an insurance company, and the workers' compensation transaction and program with Cascade is contrary to law. The revocation of Huff's insurance agent license by the State of Kentucky in 1998 due to "demonstrated lack of fitness, trustworthiness, misappropriation of premium,[105] and his criminal history would defeat his ability to be licensed or in control in any insurance enterprise. But by using the front "Midwest" and naming others as its members and managers in publicly-filed documents, he was able to continue to operate in the business of insurance, deceptively, and contrary to law, and in that process, able to get his hands on millions of dollars of premium, which he then dissipated and misused, and which was able to be used for any purpose desired by the individual defendants.

The Court should disregard the Midwest corporate entity and enter awards in favor of plaintiff and against Danny Pixler, Anthony Huff, and Sheri Huff, jointly and severally, on the following claims and amounts for which Midwest is liable:

(1) breach of third party beneficiary contract as found by the jury against Midwest in the amount of $3,348,140;

(2) civil conspiracy as found by the jury against Midwest in the amount of $19,310,744.00;

(3) violation of the Consumer Protection Act as found by the jury against Midwest in the amount of $19,310,744.00;

(4) violation of the Criminal Profiteering Act as found by the jury against Midwest in the amount of $820,900;

(5) misappropriation as found by the jury against Midwest in the amount of $3,348,140;

---

[105] **Trial testimony of Anthony Huff**, 5/13/10, p. 3, lines 19 – 22; p. 4, lines 7 – 11.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 22
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

(6) unjust enrichment against Midwest in the amount of $19,310,744.00;

(7) constructive trust against Midwest in the amount of $7,689,831.00; and

(8) promissory estoppel against Midwest in the amount of $19,310,744.00.

**F.    Exemplary Damages against Defendants Midwest Merger Management LLC, Anthony Huff, Sheri Huff, and Danny Pixler under the Consumer Protection Act.**

Pursuant to RCW 19.86.090, plaintiff is also entitled to an exemplary award of treble damages against each defendant. For a violation a RCW 19.86.020, as found by the jury here, the court may increase the award up to an amount not to exceed three times the actual damages sustained, but not to exceed $25,000. The jury found each defendant liable under the Consumer Protection Act, so each is responsible for a treble damages award. The Court should enter an award against each defendant in the maximum amount of $25,000 pursuant to the Consumer Protection Act.

**G.    Exemplary Damages against Defendants Anthony Huff, Sheri Huff, and Midwest Merger Management LLC under the Criminal Profiteering Act.**

The Criminal Profiteering Act, Ch. 9A.82 RCW, permits an award of exemplary treble damages, without a cap. RCW 9A.82.100(4)(d) provides that following a determination of liability, the court, in its discretion, may increase the award to up to three times the actual damages sustained. Here, the jury determined that defendants Anthony Huff, Sheri Huff and Midwest each violated the Criminal Profiteering Act, and found the actual damages for such violation to be $820,900. Under the circumstances of this case, this Court should exercise its discretion and award the maximum allowed by statute, three times the actual amount found by the jury, or $2,462,700.00 to be awarded against Anthony Huff, Sheri Huff and Midwest each.

Further, because Midwest was found to have violated the Criminal Profiteering Act, and because the corporate entity Midwest should be disregarded rendering the individuals liable, the

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 23
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

Court should also enter an award also against Danny Pixler, individually, for the actual damages under the Criminal Profiteering Act, and treble that amount to total $2,462,700.

## H. Conclusion

The amounts herein do not include the costs of suit, investigative expenses, litigation expenses, or reasonable attorneys' fees as permitted under the Consumer Protection Act and the Criminal Profiteering Act, or the taxable costs permitted by court rule. Plaintiff's petition for costs, expenses and fees will be submitted following entry of judgment on the jury verdict, the equitable claims, and the exemplary damage claims.

Plaintiff requests that the Court render a decision and enter judgment on the claims of unjust enrichment, constructive trust, promissory estoppel, and disregard of the corporate entity. A proposed judgment form is attached at Appendix B hereto, including the amounts as to each defendant for each claim in this matter.

Dated this _____ day of June, 2010.

GORDON THOMAS HONEYWELL LLP

By___/s/ Victoria L. Vreeland_____
    Victoria L. Vreeland, WSBA No. 08046
    vvreeland@gth-law.com
    Donald S. Cohen, WSBA No. 12166
    dcohen@gth-law.com
    Victor J. Torres, WSBA No. 38781
    vtorres@gth-law.com
    Attorneys for Plaintiff

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
JUDGMENT ON CLAIMS - 24
(C06-0697RSL)
[209093 v1.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

# **Appendix A**

# Midwest Financials



|  | Exhibit 74 Midwest Balance Sheet 12/31/03 | Exhibit 149 Midwest Net Worth Statement 2/24/04 | Exhibit 77 Midwest Balance Sheet 12/31/04 |
|---|---|---|---|
| Assets | 18,161,098 | 25,852,079 | 22,022,837 |
| Liabilities | 9,355,652 | 810,000 | 10,550,687 |
| Equity | 8,805,446 | 25,852,079 | 9,153,111 |
|  | Anthony Huff Note Receivable | No Anthony Huff Note Receivable | Anthony Huff Note Receivable |

1

# **Appendix B**

# APPENDIX B  -  Proposed Form of Judgment

Plaintiff proposes that the **Judgment on Jury Verdict and Claims Reserved by the Court** be entered. The proposed form of judgment is attached. It includes judgments against each of the defendants as detailed below, based on the jury verdict and on the equitable claims.

A.     Against **Midwest Merger Management LLC,** jointly and severally, (1) for $3,348,140 for breach of third party beneficiary contract, as found by the jury; (2) for $19,310,744.00 for civil conspiracy as found by the jury; (3) for $19,310,744.00 for violation of the Consumer Protection Act as found by the jury; (4) for $820,900 for violation of the Criminal Profiteering Act as found by the jury; (5) for $19,310,744.00 for unjust enrichment; (6) for $7,689,831.00 for constructive trust; (7) for $19,310,744.00 for promissory estoppel; (8) for $25,000.00 exemplary damages under the Consumer Protection Act; and (9) for $2,462,700.00 under the Criminal Profiteering Act, **for a total against Midwest of $21,798,444.00.**

B.     Against **Anthony Huff,** individually, and jointly and severally, (1) for $3,348,140 for breach of third party beneficiary contract as found by the jury against Midwest, based on piercing the corporate veil; (2) for $19,310,744.00 for civil conspiracy as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (3) for $19,310,744.00 for violation of the Consumer Protection Act as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (4) for $820,900 for violation of the Criminal Profiteering Act as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (5) for $19,310,744.00 for unjust enrichment; (6) for $7,689,831.00 for constructive trust; (7) for $19,310,744.00 for promissory estoppel based on piercing the corporate veil; (8) for

$25,000.00 exemplary damages under the Consumer Protection Act; (9) for $2,462,700.00 under the Criminal Profiteering Act for treble damages, against him individually as found by the jury, and due to piercing the corporate veil for the enhanced damages against Midwest; (10) for $19,310,744.00 for fraud as found by the jury against him; (11) for 51% of $19,310,744.00 ($9,848,479.40) for negligent misrepresentation as found by the jury against him, **for a total against Anthony Huff of $21,798,444.00.**

C.     Against **Sheri Huff**, individually, and jointly and severally, (1) for $3,348,140 for breach of third party beneficiary contract as found by the jury against Midwest, based on piercing the corporate veil; (2) for $19,310,744.00 for civil conspiracy as found by the jury against her individually, and as found by the jury against Midwest, based on piercing the corporate veil; (3) for $19,310,744.00 for violation of the Consumer Protection Act as found by the jury against her individually, and as found by the jury against Midwest, based on piercing the corporate veil; (4) for $820,900 for violation of the Criminal Profiteering Act as found by the jury against her individually, and as found by the jury against Midwest, based on piercing the corporate veil; (5) for $19,310,744.00 for unjust enrichment; (6) for $7,689,831.00 for constructive trust; (7) for $19,310,744.00 for promissory estoppel based on piercing the corporate veil; (8) for $25,000.00 exemplary damages under the Consumer Protection Act; (9) for $2,462,700.00 under the Criminal Profiteering Act for treble damages, against her individually as found by the jury, and due to piercing the corporate veil for the enhanced damages against Midwest, **for a total against Sheri Huff of $21,798,444.00.**

D.     Against **Danny Pixler**, individually, and jointly and severally, (1) for $3,348,140 for breach of third party beneficiary contract as found by the jury against Midwest, based on piercing the corporate veil; (2) for $19,310,744.00 for civil conspiracy as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (3) for $19,310,744.00 for violation of the Consumer Protection Act as found by the jury against him individually, and as found by

the jury against Midwest, based on piercing the corporate veil; (4) for $820,900 for violation of the Criminal Profiteering Act as found by the jury against Midwest, based on piercing the corporate veil; (5) for $19,310,744.00 for unjust enrichment; (6) for $7,689,831.00 for constructive trust; (7) for $19,310,744.00 for promissory estoppel based on individual liability and on piercing the corporate veil; (8) for $25,000.00 exemplary damages under the Consumer Protection Act; (9) for $2,462,700.00 under the Criminal Profiteering Act for treble damages against him individually based on piercing the corporate veil for the enhanced damages against Midwest; (10) for $19,310,744.00 for fraud as found by the jury against him; (11) for 49% of $19,310,744.00 ($9,462,264.50) for negligent misrepresentation as found by the jury against him, **for a total against Danny Pixler of $21,798,444.00.**

THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MIKE KREIDLER, Insurance Commissioner for
the State of Washington and as Receiver for
Cascade National Insurance Company, in
Liquidation,
                      Plaintiff,
    v.

DANNY L. PIXLER and ROXANN PIXLER,
individually and their marital community;
ANTHONY HUFF and SHERI HUFF,
individually and their marital community;
AMERICAN STAFF RESOURCES OF
CALIFORNIA, INC., a Delaware corporation;
CERTIFIED SERVICES, INC., a Nevada
corporation; MIDWEST MERGER
MANAGEMENT, LLC, a Kentucky Limited
Liability Company; and JOHN DOES 1 – 10,
                    Defendants

NO. C06-0697RSL

[PROPOSED] JUDGMENT ON JURY
VERDICT AND CLAIMS RESERVED BY
THE COURT

THIS MATTER having come on for trial before the Hon. Robert S. Lasnik, Chief Judge

of the above-entitled court, beginning on May 3, 2010, and the parties having presented their

evidence to the Court and jury, and having made their closing arguments to the jury on May 18,

2010, and the jury having deliberated and having returned a Verdict on May 21, 2010, which

Verdict Form was filed herein on May 21, 2010, under Dkt. 458; and the Court having

[PROPOSED] JUDGMENT ON JURY VERDICT - 1 of 5
(C06-0697RSL)
[PLD-[PROPOSED] JUGMENT ON JURY VERDICT.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

considered the post-verdict memoranda from the parties on the claims reserved to the Court pursuant to the Court's Order Denying Request for Entry of Judgment and Setting Briefing Schedule filed herein on May 26, 2010, under Dkt. 352; and the Court having rendered its decision on the claims reserved to the Court, now therefore,

ORDERED that judgment is hereby entered in favor of plaintiff in the amounts set forth herein as to each defendant, which judgment is joint and several as follows:

A.    Against **Midwest Merger Management LLC,** jointly and severally, (1) for $3,348,140 for breach of third party beneficiary contract, as found by the jury; (2) for $19,310,744.00 for civil conspiracy as found by the jury; (3) for $19,310,744.00 for violation of the Consumer Protection Act as found by the jury; (4) for $820,900 for violation of the Criminal Profiteering Act as found by the jury; (5) for $19,310,744.00 for unjust enrichment; (6) for $7,689,831.00 for constructive trust; (7) for $19,310,744.00 for promissory estoppel; (8) for $25,000.00 exemplary damages under the Consumer Protection Act; and (9) for $2,462,700.00 under the Criminal Profiteering Act, **for a total against Midwest of $21,798,444.00.**

B.    Against **Anthony Huff,** individually, and jointly and severally, (1) for  $3,348,140 for breach of third party beneficiary contract as found by the jury against Midwest, based on piercing the corporate veil; (2) for $19,310,744.00 for civil conspiracy as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (3) for $19,310,744.00 for violation of the Consumer Protection Act as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (4) for $820,900 for violation of the Criminal Profiteering Act as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (5)

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

for $19,310,744.00 for unjust enrichment; (6) for $7,689,831.00 for constructive trust; (7) for $19,310,744.00 for promissory estoppel based on piercing the corporate veil; (8) for $25,000.00 exemplary damages under the Consumer Protection Act; (9) for $2,462,700.00 under the Criminal Profiteering Act for treble damages, against him individually as found by the jury, and due to piercing the corporate veil for the enhanced damages against Midwest; (10) for $19,310,744.00 for fraud as found by the jury against him; (11) for 51% of $19,310,744.00 ($9,848,479.40) for negligent misrepresentation as found by the jury against him, **for a total against Anthony Huff of $21,798,444.00.**

C.      Against **Sheri Huff,** individually, and jointly and severally, (1) for  $3,348,140 for breach of third party beneficiary contract as found by the jury against Midwest, based on piercing the corporate veil; (2) for $19,310,744.00 for civil conspiracy as found by the jury against her individually, and as found by the jury against Midwest, based on piercing the corporate veil; (3) for $19,310,744.00 for violation of the Consumer Protection Act as found by the jury against her individually, and as found by the jury against Midwest, based on piercing the corporate veil; (4) for $820,900 for violation of the Criminal Profiteering Act as found by the jury against her individually, and as found by the jury against Midwest, based on piercing the corporate veil; (5) for $19,310,744.00 for unjust enrichment; (6) for $7,689,831.00 for constructive trust; (7) for $19,310,744.00 for promissory estoppel based on piercing the corporate veil; (8) for $25,000.00 exemplary damages under the Consumer Protection Act; (9) for $2,462,700.00 under the Criminal Profiteering Act for treble damages, against her individually as found by the jury, and due to piercing the corporate veil for the enhanced damages against Midwest, **for a total against Sheri Huff of $21,798,444.00.**

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

D.    Against **Danny Pixler**, individually, and jointly and severally, (1) for $3,348,140 for breach of third party beneficiary contract as found by the jury against Midwest, based on piercing the corporate veil; (2) for $19,310,744.00 for civil conspiracy as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (3) for $19,310,744.00 for violation of the Consumer Protection Act as found by the jury against him individually, and as found by the jury against Midwest, based on piercing the corporate veil; (4) for $820,900 for violation of the Criminal Profiteering Act as found by the jury against Midwest, based on piercing the corporate veil; (5) for $19,310,744.00 for unjust enrichment; (6) for $7,689,831.00 for constructive trust; (7) for $19,310,744.00 for promissory estoppel based on individual liability and on piercing the corporate veil; (8) for $25,000.00 exemplary damages under the Consumer Protection Act; (9) for $2,462,700.00 under the Criminal Profiteering Act for treble damages against him individually based on piercing the corporate veil for the enhanced damages against Midwest; (10) for $19,310,744.00 for fraud as found by the jury against him; (11) for 49% of $19,310,744.00 ($9,462,264.50) for negligent misrepresentation as found by the jury against him, **for a total against Danny Pixler of $21,798,444.00.**

IT IS FURTHER ORDERED that plaintiff may submit its petition for recovery of additional relief for costs, investigative costs, expenses of litigation, and reasonable attorneys' fees within no more than thirty (30) days from the date of entry of this Judgment.

DATED this _____ day of _____, 2010.

_____
Robert S. Lasnik
United States District Judge

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

1   Presented By:

2   GORDON THOMAS HONEYWELL LLP

3
    By:  s/Victoria L. Vreeland
4   Victoria L. Vreeland, WSBA No. 8046
    Donald S. Cohen, WSBA No. 12480
5   Victor J. Torres, WSBA No. 38781
    Attorneys for Plaintiff
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

[PROPOSED JUDGMENT ON JURY VERDICT - 5 of 5
(C06-0697RSL)
[PLD-[PROPOSED] JUGMENT ON JURY VERDICT.doc]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575